**Harold A. KIMBALL and Clara G. Kimball, his wife**

v.

**SHELL OIL COMPANY, a Delaware corporation.**

**Civ. A. No. 10328.**

United States District Court
D. Maryland.

Aug. 3, 1959.

Hyman Ginsberg, Ginsberg & Ginsberg, Baltimore, Md., Edward Turner, Turner & Turner, Centreville, Md., for plaintiffs.

A. Adgate Duer, Niles, Barton, Yost & Dankmeyer, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

This is an action by Harold A. Kimball (Kimball) and Clara G. Kimball (Mrs. Kimball) his wife, against Shell Oil Company (Shell), originally brought in the Circuit Court for Queen Anne's County, Maryland, and removed to this court by the defendant on the ground of diversity of citizenship. The relief prayed was that a declaration be made that a lease between the parties, and all agreements with reference thereto, are null and void; or that Exhibit B to the lease, imposing restrictions upon the use of adjacent property of plaintiffs, be declared null and void. The trial was directed primarily toward the latter prayer.

Findings of Fact.

Plaintiffs in 1943, with the aid of counsel, purchased from Mrs. Kimball's father a truck farm of about 28 acres, in Grasonville, Queen Anne's County, Maryland. The Kimballs lived on the farm, Kimball until 1952 carrying on his trade as a carpenter, a truck farmer, and operating a primitive two-pump gasoline station.

In 1952 the Blue Star Memorial Highway, connecting with the Chesapeake Bay

Bridge, was completed, plaintiffs' property adjoining said highway to the south. Hess and Hissey Lane divided plaintiffs' property into two parcels, the one to the west of the lane, triangular in shape, containing nearly seven acres, and the one to the east containing approximately 16 acres. Blue Star Memorial Highway is a denied access [1] main highway, Hess and Hissey Lane leading to, over and across it.

Prior to May 1954, plaintiffs [2] and defendant carried on negotiations for the installation of a gasoline service station on plaintiffs' land. Defendant's first choice was the southeast corner of Hess and Hissey Lane, and the Highway. Plaintiffs would not agree to this; they regarded it as too valuable a piece of property to be used for a filling station; they contemplated a motel and restaurant.[3]

Negotiations thereafter proceeded with respect to the southwest corner. Shell's standard form of lease was sent to the Kimballs in February, 1954. Several changes were made, and on May 26, 1954, various documents [4] were presented for signature. The rent had previously been discussed between the Kimballs and Shell's representatives.

There is some confusion as to just exactly where and at what time on May 26, 1954, the lease (from the Kimballs to Shell, see footnote 4) was signed, the Kimballs admitting, however, that they did execute and acknowledge the lease on that date, but denying that the controversial Exhibit B was then a part of the document. The court finds as facts, for reasons to be set forth below, that Exhibit B was at the time Kimball, and Mrs. Kimball, signed, attached to and a part of the lease. The court also finds that both Kimball and Mrs. Kimball went over the lease page by page before signing; and that at least parts of the lease were read to them before they signed. Kimball and Mrs. Kimball then went to a bank in Centreville, where they acknowledged the lease.

Four sets of papers were executed, all of which were retained by Shell's representatives. They were executed by Shell on June 11, 1954. On June 14, one complete set was sent to the Baltimore office for its files; one complete set was sent to Baltimore for delivery to plaintiffs, which was done by letter dated June 17, 1954, hereafter to be quoted; on June 15, 1954, the lease, deed of trust and assignment of rent were sent to an attorney in Centre-

1. Except by existing intersecting roads and lanes.

2. The actual negotiations leading up to the signing of the lease in question were carried on directly by Kimball and representatives of Shell, but Mrs. Kimball was kept advised of the nature of developments.

3. Defendant's real estate representative testified that in these negotiations in which Shell sought the southeast corner, Kimball, in addition to stating that that land was too valuable to be used for a filling station, and that the Kimballs planned a motel and restaurant, further stated that there "never would be a service station on that land;" and that Shell's representative said that if one were put on the southwest corner, it could not succeed if later one were also put on the southeast corner. Were it necessary, the court would find these to be facts.

4. Shell's procedure in connection with new service stations is quite involved, as demonstrated in this case. On May 26, 1954 (a) plaintiffs leased to defendant 14,535 square feet on the southwest corner, to become effective upon completion of the service station, at a rental of $125 a month, for a period of 180 months, without option of renewal; (b) a financing agreement was executed, under which Shell lent plaintiffs $12,000 to be used in constructing the service station, repayable in 180 equal monthly installments with interest, to be secured by (c) a deed of trust; (d) a promissory note of plaintiffs for $12,000; and (e) assignment of rent from plaintiffs to defendant to secure the repayment of the note. Thereafter, (f) Shell leased the same premises to plaintiffs for the full term of the lease to Shell, less one day; (g) a supplemental agreement was executed upon completion of the station, and establishing the term of the original lease; (h) a supplemental sublease was executed from Shell to plaintiffs, based upon the dates fixed in (g); and (i) a dealer's agreement was executed.

ville for recording, which was done on June 23, 1954; and the fourth set was retained in the New York office.

The court finds that as executed by the Kimballs, and later by Shell, the lease had certain deletions and additions, as follows:

(a) Immediately preceding paragraph 2 there is typed:

"1A. See Exhibit 'B' " [which will be set forth in full below]. This insert has not been initialled.

(b) Printed paragraph 9 has been x'd out, and above it is typed:

"9. See Exhibit 'B' "

The initials "HAK" [Harold A. Kimball] and "CBS" [Clifford B. Schulz, Shell's Real Estate Manager for the Baltimore Division] are in the margin opposite the eliminations.

In the standard printed form, Shell was given the option to purchase the premises, at a price to be inserted, at any time during the term of the original lease.

(c) Paragraph 10 gives Shell the option to purchase the premises at the price and upon the terms of any offer made by a third person to the Kimballs. The printed words "in addition, and without prejudice to its rights under Article 9" have been stricken. This is initialled "CBS."

(d) There was stricken from paragraph 13 the concluding sentence giving Shell the right to terminate the lease at any time upon giving the Kimballs 90 days' notice, and paying a consideration to be inserted. This was initialled "HAK" and "CBS".

Exhibit B reads as follows:

"Attached to and forming part of the lease from Harold A. Kimball and his wife, Clara G. Kimball to Shell Oil Company, of premises in Grasonville, Maryland.

"1A. Lessor covenants and agrees that, throughout the term of this lease or any extension thereof, (a) Lessor will not erect or permit the erection of any improvement which would limit or impair the visibility of the premises to motorists northbound on Blue Star Highway, within the following described tract:

"Beginning at the point which is the northwesternmost corner of the above described leased premises and running thence westerly along the southerly line of the Baltimore and Eastern Railroad Right of Way 400 feet to a point; thence running southeasterly a distance of 813 feet, more or less, to a point in the westerly line of the leased premises; thence running northwardly along the westerly boundary line of the leased premises 100 feet more or less, to the point or place of Beginning; and (b) Lessor will not use or permit the use of other property now or hereafter owned or controlled directly or indirectly by Lessor adjoining the leased premises or within a radius of five hundred (500) feet thereof, for the purpose of advertising, selling, storing, handling or distribution of petroleum products which may compete with the business being conducted upon the leased premises.

"9. Shell may, at its option, terminate this lease at any time during the term of this lease, by giving Lessor at least thirty (30) days' notice and paying as consideration therefor, the sum of one dollar ($1.00) plus whichever is the less of (1) $5000.00 or (2) a sum equal to the unpaid balance, if any, as of the effective date of such termination, of the principal sum (plus accrued interest thereon) of a promissory note given by Lessor to Shell on or about the beginning of the term of this lease and secured by a Deed of Trust of the leased premises and an assignment of rent hereunder, which consideration Shell may, at its option, pay to Lessor or apply to the payment of such note (if then held by Shell) or to the holder (if other than Shell) for application to the payment thereof."

In the "Beginning" paragraph, changes were made in ink in the three dis-

tances, and the words "a point in the westerly line" were substituted in longhand printing for the typed words "the southwesternmost corner." This paragraph was initialled in the margin "HAK" and "CBS".

The grounds for rescission are (1) that plaintiffs did not, until about the middle of 1957, when, having been unable to finance the proposed motel and restaurant, they decided to sell or lease the southeast corner and placed the property in the hands of their son-in-law, a broker, learn of the restriction on that corner; (2) that the initialling of Exhibit B by Kimball took place after the execution of the lease and after June 17, 1954; and (3) that the initialling of Exhibit B by Kimball, whenever done, was not with the knowledge, authority or approval of Mrs. Kimball.

The court finds for the defendant on the whole evidence, and more particularly for the following reasons and upon the following grounds:

1. The inherent probabilities.

The parties are in agreement that the southeast corner was the better commercial corner. Defendant wanted it for the filling station. Plaintiffs refused; that corner was too valuable, and they were reserving it for other uses. Therefore, the plaintiffs would have had no reasonable grounds for objecting to the restriction, which was not in conflict with their proposed development. On the other hand, it is highly improbable, if not incredible, that Shell would have advanced $12,000 for a 15-year filling station to be operated on the less desirable corner, and leave itself wide open to the construction of a competitive station on the opposite, and better, corner.

2. The reliability of defendant's testimony.

The court was favorably impressed by the direct and frank testimony of defendant's witnesses, who had participated in many similar deals, and who testified that Exhibit B was a part of the lease when it was executed by the Kimballs. Moreover, on this critical point

they were corroborated by written evidence.

The parties are in agreement that the papers signed on May 26, 1954 were executed in quadruplicate.

(a) A memorandum to the Shell Baltimore office dated June 14, 1954, forwarded two copies each of the lease, financing agreement, promissory note, deed of trust and assignment of rent, with instructions that: "One copy of each is for Lessor—one copy each for your files."

(b) On June 15, 1954, there were forwarded by Shell to an attorney in Centreville, Maryland "for your inspection and for recording in the order listed", Lease from the Kimballs to Shell; Deed of Trust from the Kimballs to Schulz, Trustee, securing indebtedness of $12,000; and assignment of rent by the Kimballs to Shell as additional security for their indebtedness of $12,000.

(c) On June 17, 1954, Shell's Baltimore office sent the Kimballs a letter enclosing "copies of all papers executed by" them in connection with the filling station. This is so important, both with respect to the testimony of plaintiffs and defendant, that it is set out in full:

"Enclosed herewith are copies of all papers executed by you and Mrs. Kimball in connection with the new construction which we noticed yesterday to be underway.

"We have arranged to have these recorded in Centerville so they will be on public record. However, you should still retain these copies among your important papers such as your deed to the home, insurance policies, etc.

"We still have the lease whereunder we lease back to you the premises. Just as the description in these papers had to be changed to conform to the survey so has that one to be changed. We will need your initials to the changes or the execution of a new form. They neglected to do this when the papers which we are returning were prepared. It is now being done.

"I will be down next week along with the salesman who will work with you upon completion and will have those papers with me then.

"Good to see Choptank in action."

The court considers this letter highly significant in many respects:

(i) Copies of all papers executed by the Kimballs are enclosed.

(ii) Reference is made to the recordation of "these" papers.

(iii) Plaintiffs are advised to "retain these papers among your important papers." The court does not believe that the thesis of Poe's "Purloined Letter"—beguilement by the obvious—can be applied. The court is positive that a defendant which had introduced a rider after execution of the lease by plaintiffs would not caution the victims safely to preserve the evidence of defendant's perfidy; particularly when such evidence might be examined at any time, especially where its value was emphasized.

(iv) Reference is made to the fact that the "description in *these* papers had to be changed" (emphasis supplied). This to any thinking person would raise the question of what description had been changed; and the only change was in Exhibit B.

The court finds that defendant's communication with plaintiffs was straightforward, open, supportive of defendant's position and totally inconsistent with that of plaintiffs.

3. The inconsistencies and unpersuasive nature of plaintiffs' testimony.

While Mrs. Kimball testified flatly in chief that Exhibit B was not a part of the lease when she signed it and that there were no references to Exhibit B in the lease; and that no changes were initialled, her testimony was greatly weakened on cross-examination. She admitted receipt of a copy of the lease after June 17, 1954, but did not know if the initials HAK were *then* on (although the instrument remained in the Kimballs' possession at all times after receipt). While positive that there was no Exhibit·

B or reference thereto in the lease, she had no recollection of the language of printed paragraph 9, or of paragraph 13 before it was changed.

Of primary significance, however, was her statement on cross-examination that Shell's representative explained to her that there were restrictions on the side [site ?] where the station was to be, and that there was something in the lease about side line restrictions. *The only place in which reference is made to "restrictions" on either side of Hess and Hissey Lane is in Exhibit B,* which prohibits the erection of improvements on the southwest parcel that would impair visibility to northbound motorists; and the prohibition of a competitive business within 500 feet of the leased premises.

Later Mrs. Kimball tried to modify this testimony by saying that she could not remember if any restrictions were in the lease. Under all the circumstances, including her attitude on the stand and her manner of testifying, the court accepts her first version; that there *was* something in the lease about side line restrictions—which could have been only in Exhibit B.

Kimball flatly testified in chief that Exhibit B "could not have been" a part of the lease when he signed; that the inserts "1A. See Exhibit 'B' " and "9. See Exhibit 'B' " "could not" then have been in the lease; and that his initials "had to be" affixed on or after June 17, 1954. The reasons for the use (repeatedly) of the words above quoted is interesting, revealing, and devastating.

(a) Kimball did not profess an independent recollection of the absence of Exhibit B, and the two references thereto. His reconstruction was that if the printed lease had been changed, regardless of how—eliminations or insertions—and in how many places, before signing, his signature to the lease would have included all such changes; therefore there would have been no need to initial them; ergo, if his initials appeared, it "had to be" because the changes were not in the lease when he signed. The court is not convinced by, and does not accept, this

rationalization, which in any event proves too much.

There are no initials opposite the insert "1A. See Exhibit 'B' ".[5] On Kimball's theory this proves conclusively that the insert *was* in the lease when Kimball signed.

(b) The conclusion that the initials HAK "had to be" placed on the papers by Kimball "on or after June 17, 1954," is based upon Shell's letter of the same date, heretofore quoted in full. Apparently the reference to initialling the changes in the description in the lease back, or execution of a new one, has been construed by Kimball as a reference to the original lease. No reasonable construction of the letter justifies this. Moreover, the letter refers to the future need of initialling of the lease back. It not only does not refer to initialling any of the already executed papers, but states that they are to be recorded, and a set is sent to Kimball to be preserved by him. The only reasonable conclusion is that the papers already bore Kimball's initials.[6]

Kimball's testimony was, as his attorneys admitted, "conflicting." He first said that the "lease" did not come with the letter of June 17, 1954, but that Shell's representative brought the four sets of papers to him "about" June 17, 1954 for initialling. Then he said that he was unable to say if the lease came with the letter; it "could have been". He followed this with the statement that all the papers were brought by Shell's representative; the representative "must have" brought them, but when pressed

said he could not say "yes" or "no." Whatever the incident was, it must have been "right after" the letter of June 17, 1954.

Kimball's testimony as to his awareness of Exhibit B was equally elusive. There had been some discussion of restrictions on the site, and some sketches with respect to the construction area and signs on the southwest corner. He was unable to say why his initials appear on Exhibit B; whether or not because of the changes on it. When he had a survey made in July 1957 he "did not know of Exhibit B in detail"; he did not then know what it was about, if he knew there was one. Finally, he said that he did not know if he then knew there was an Exhibit B; that it was some time in 1957 when he first saw Exhibit B "to get down and understand" it.

Kimball did not deny answering in his deposition that he had read Exhibit B on May 26, 1954; that before the lease was signed he initialled paragraph 9 because it had slipped in, so he "had to" initial it; that he initialled Exhibit B which he did not read "thoroughly." His explanations for these answers were the stock ones that he was "confused" at the time the deposition was taken; that he did not quite realize what he was saying; and that he had answered without enough time and thought.

Without meaning to intimate, much less hold, that plaintiffs were deliberately testifying falsely,[7] their testimony is inherently improbable, is inconsistent, and is directly contradicted by credible

5. After Kimball had several times repeated his position that if initialled, the change must have been after the lease was signed, but that it was not necessary to initial any changes made before signing, the court specifically asked Kimball about the insert "1A. See Exhibit 'B' " and his answer was that the insert was not in when the lease was signed, because the insert was initialled by him. As it was *not* initialled, the insert, on Kimball's theory, "must have" been in when the lease was signed.

6. In their opening statement, counsel for plaintiffs took the same position as Kim-

ball's testimony. When it clearly appeared how untenable this was, they attempted to shift this to initialling by Kimball at some undetermined—and undeterminable—time between May 26, 1954 and June 23, 1954.

7. The court believes plaintiffs were subject to the ratiocination so often encountered when a party later realizes that he has made what appeared to be a good bargain, but which develops to have been a disadvantageous one. The process is: "I could not have made such a mistake. Therefore I did not. But the mistake appears. Therefore the other party must have 'put something over on me.' "

testimony on behalf of the defendant, supported documentarily. The court therefore rejects plaintiff's testimony, accepts that of defendant, and finds as facts that Exhibit B and the references thereto were part of the main lease at the time it was signed by plaintiffs; and that the initials "HAK", now appearing on the recorded document, were likewise there before execution by each plaintiff. The court therefore concludes as a matter of law that plaintiffs are entitled to no relief, and that their complaint should be dismissed.

The foregoing findings make it unnecessary to consider whether or not under the circumstances Kimball could be considered the agent of Mrs. Kimball, Grauel v. Rohe, 1945, 185 Md. 121, 126–127, 43 A.2d 201; Kvedera v. Mondravitzky, 1924, 145 Md. 260, 263–266, 125 A. 591, or the effect of failure of both plaintiffs to initial the changes, Routzahn v. Cromer, Md.1959, 150 A.2d 912, 915.

The foregoing opinion shall serve as the court's findings of fact and conclusions of law (F.R.Civ.P. 52(a), 28 U.S. C.A.) but either party may submit requests for other or additional findings.

The complaint is dismissed with costs.