PIOTR GIBULA ET AL. *v.* JOHN SAUSE ET AL.
[No. 12, October Term, 1937.]

*Decided October 29th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Marion A. Figinski,* for the appellants.

*Michael J. Manley,* for the appellees.

URNER, J., delivered the opinion of the Court.

On July 13th, 1936, the plaintiffs, Piotr Gibula and Eva Gibula, his wife, by an agreement in writing of that date, purchased from the defendants, John Sause and Helen Sause, his wife, the "property known as No. 530 S. Kenwood Avenue," in Baltimore City, "including the grocery and meat business therein, the stock and fixtures and the good will thereof at and for the sum of $8700.00 in cash and leasehold property No. 312 S. Collington Avenue," as the "total consideration." There was a deposit of $500 by the purchasers when the contract was signed, and it was agreed that $500 additional should be paid two days later. The purchasers were "to take immediate possession and run the business," and "the money taken in during the time awaiting the payment of the balance of the purchase money" was to be "used to pay for new stock, and the balance if any to be kept by both parties until" settlement for the purchase was completed, which was to occur within fifteen days from the date of the contract. The plaintiffs, with the assistance of the defendants, conducted the store business for a period of four days beginning July 14th. At the end of that period, they surrendered possession of the store to the defendants upon the ground that the purchase had been induced by alleged misrepresentations as to the current proceeds of the business. The additional sum of $500 had been paid on July 15th, as required by the contract, on account of the purchase price. This suit in equity is for the rescission of the contract of purchase, and the recovery of the money paid under its terms.

The bill of complaint alleges that the plaintiffs contracted with the defendants in reliance upon representations by them that the gross weekly receipts from their store business ranged from $600 to $700. The answer of the defendants denied that allegation, and stated that they had represented the business to produce average weekly receipts of $550, which occasionally increased to $600. It appears from the testimony that the sales amounted to $186 for the four days, from Tuesday to Friday, during which the plaintiffs were in possession of the store, but that the total receipts were $547.44 for the week.

In our opinion, the chancellor was right in his conclusion that the charge of misrepresentation was not sufficiently supported by the evidence. There was a serious conflict in the testimony as to what statements were made, in regard to the volume of the business, while the negotiations for the purchase were in progress, and we are convinced that the burden of proof assumed by the plaintiffs was not sustained.

But the case presents another important problem. It is admitted by the defendants that they accepted a surrender of the property and business which they had contracted to sell and convey to the plaintiffs, and the effect of that acceptance upon the rights of the parties remains to be considered.

There is a virtual agreement in the testimony as to the circumstances of the retransfer of possession. Mr. Gibula, who was a carpenter by trade, testified that on Friday afternoon, July 17th, he complained to Mr. Sause of the receipts of the business being less than the amount promised, and that Mr. Sause said: "Well, you are not for the grocery business, you better take your saw and hatchet out and go to your trade." The response of Mr. Gibula was: "Here is your key, Mr. Sause, how about my money?" Mr. Sause said: "I am going to see about your money." Mr. Gibula's version of the incident concluded with the statement: "And he takes the key and

runs the business." From the testimony of Mr. Sause, we quote as follows:

"Q. What was said between you and Mr. Gibula at the time he turned the keys back to you    A. Well, now, Mr. Gibula came in that afternoon around 3:30. He had been out. I was sitting down at the safe. I looked at him, and I smiled at him, and I said, where have you been, do you want to get fired? I was kidding him. * * * He looked at me and he said, I am going to quit. I said going to quit, what are you talking about? * * * I said, you can't do that, why do you want to leave?. He said, you promised me  *  *  *  between five hundred and five hundred and fifty dollars a week; you are not doing it. * * * I said, we are doing that and we are doing more than that. I said an average of $550 a week, I will show you the books any time you want to see them. * * *

"Q. When he turned the keys over was anything else said? A. I said, Pete, take my advice, don't buy a grocery store because you are not fitted for a grocery store, that is my advice to you."

The following is an extract from Mrs. Gibula's testimony:

"Q. On Friday, when your husband turned the keys over, were you there? A. Yes, sir.

"Q. What did they say? A. They told my husband they were going to return the money; you see a lawyer, I will see my lawyer. They were going to return the money back.

"Q. When your husband turned the keys over was there anything said to you or to him? A. Mr. Sause told my husband he had better go back to his trade, his work, because he couldn't understand about the store. Mr. Sause told him to go back to the saw business."  .

According to Mr. Sause's own testimony, he not only accepted the return of the keys, but he also advised Mr. Gibula against such a purchase as the one which he was repudiating. That conduct and advice could not be regarded as consistent with an intention to require the

fulfillment of their executory contract of sale. Instead of insisting upon compliance with the terms of the purchase, Mr. Sause, by act and word, acquiesced in its abandonment. No other significance can reasonably be attributed to the admitted facts. The same attitude appears to have been assumed by Mrs. Sause, the codefendant, who advised Mrs. Gibula to go back to the sewing work in which she had been employed.

In the case of *Graves v. White,* 87 N. Y. 463, 465, involving a written agreement for the transfer of real estate, the Court of Appeals of New York said that: "The refusal of one party to perform his contract amounts on his part to an abandonment of it. The other party thereupon has a choice of remedies. He may stand upon his contract, refusing assent to his adversary's attempt to rescind it, and sue for a breach, or, in a proper case, for a specific performance, or he may assent to its abandonment, and so effect a dissolution of the contract by the mutual and concurring assent of both parties. In that event he is simply restored to his original position, and can neither sue for a breach or compel a specific performance, because the contract itself has been dissolved." That principle is stated with citation of cases in 66 *C. J.* p. 733, and *Black on Rescission and Cancellation* (2nd Ed.) sec. 526.

When a contract of sale has been mutually rescinded or abandoned, the right of the parties to be placed *in statu quo* is well recognized. In *L. R. A.* 1918 B, page 550, it is said that: "Where the contract has been abandoned or rescinded by the consent of the vendor he must account to the vendee for the amount received on the purchase price." The rule is, in effect, similarly stated in 59 *A. L. R.* page 218; 27 *R. C. L.* p. 641; 66 *C. J.* pp. 733, 1474; and *Black on Rescission and Cancellation* (2nd Ed.) sec. 535. In *Gunby v. Sluter,* 44 Md. 237, 250, it was held that a mutual rescission of a contract for the sale of land entitled the vendee to the return of the purchase money paid, "and no express promise was necessary." In that case it was found to be unnecessary to

decide, in the absence of objections to evidence, whether a mutual rescission of a written contract for the sale of land could be proved by parol. In *Restatement, Contracts,* sec. 222, it is said that a contract within the statute of frauds may be orally rescinded "unless the prior contract is enforceable and the contract to rescind involves the re-transfer of some subject-matter which is within the Statute." But there is adequate support for the conclusion that parol evidence is admissible to prove such a rescission by a mutual abandonment involving an actual and accepted redelivery of possession. *Jennison v. Leonard,* 21 Wall 302, 309 (88 U. S.) 22 L. Ed. 539; *Brownfield's Excrs. v. Brownfield,* 151 Pa. 565, 25 A. 92; *Graves v. White,* 87 N. Y. 463, 465; *Baker v. Lambers,* 261 Mich. 86, 245 N. W. 578; *Stuckrath v. Briggs & Turivas,* 329 Ill. 555, 161 N. E. 91; *Cunningham v. Cunningham,* 46 W. Va. 1, 32, S. E. 998; *Crane v. Decamp,* 21 N. J. Eq. 414, 422; *May v. Getty,* 140 N. C. 310, 53 S. E. 75; *27 R. C. L.* p. 639; *66 C. J.* p. 730; *Black on Rescission and Cancellation* (2nd Ed.) secs. 524, 528; *2 Coe's Ed. Alexander's British Statutes,* p. 740.

In *Jennison v. Leonard, supra,* the Supreme Court said: "This was one of the sales of real estate by contract, so common in this country, in which the title remains in the vendor and the possession passes to the vendee. * * * The interest of the vendee is equitable merely. * * * No mode of terminating an equitable interest can be more perfect than a voluntary relinquishment, by the vendee, of all rights under the contract, and a voluntary surrender of the possession to the vendor."

In *Herzog v. Sawyer,* 61 Md. 344, it was held that a waiver of performance, or the abandonment, of an agreement under seal may be proved by parol evidence.

Ordinarily the appropriate remedy for the enforcement of a right to the return of purchase payments is an action at law for money had and received. If the present vendees had brought such a suit, the legal effect of the uncontradicted evidence, as indicating a mutual abandonment of the sale agreement, would be determina-

ble by the court as a question of law. *Commercial Realty Co. v. Dorsey,* 114 Md. 172, 78 A. 1099. An affirmance of the decree in this case, without prejudice, would be a method of protecting the right of the plaintiffs to sue at law for the recovery of the money paid by them under the contract subsequently abandoned. But there is an alternative course which seems to be permitted, if not required, by the rule, which this court has repeatedly approved and applied, that where in a proper case equitable jurisdiction has once attached, it will be retained for the purpose of affording full relief even beyond the extent to which the jurisdiction could originally have been invoked. *Scott v. Marden,* 153 Md. 1, 137 A. 518; *Boland v. Ash,* 145 Md. 465, 474, 125 A. 801; *Young v. Diedel,* 141 Md. 670, 672, 119 A. 448; *Linthicum v. Wash., B. & A. Elec. R. Co.,* 124 Md. 263, 273, 92 A. 917; *Shipley v. Fink,* 102 Md. 219, 220, 62 A. 360; *Miller's Equity Proc.* sec. 669. This suit for a rescission of the contract between the parties, on the ground of misrepresentation, was within the scope of the circuit court's equitable jurisdiction. *Kleiman v. Needle,* 140 Md. 107, 117 A. 3; *Needle v. Cover,* 138 Md. 646, 114 A. 698; *Tucker v. Osbourn,* 101 Md. 613, 61 A. 321. The bill of complaint included an allegation that the defendants had accepted the surrender of the store and "considered the contract at an end," but refused to return the payments which had been made on account of the purchase price. Upon the ground of abandonment, and under the prayer for general relief, the contract could be decreed in this suit to be unenforceable as against the title to the plaintiff's property, which it also involved. *Whiteford v. Yellott,* 104 Md. 191, 64 A. 936. If a rescission were decreed on the ground of alleged misrepresentation, a provision in the decree for the repayment sought by the bill would undoubtedly be within the scope of the court's authority. *Kleiman v. Needle, supra.* A decision in this case, that the contract was mutually rescinded and abandoned by the parties, justifies, in our opinion, the application of the rule that, when the jurisdiction of a court of equity

has properly attached to a case, it may proceed to decree complete relief, and thus obviate a separate suit to achieve a similar result. The decree below, which dismissed the bill of complaint, will therefore be reversed, and the cause will be remanded for a decree giving effect to the conclusions we have indicated.

> *Decree reversed, with costs, and cause remanded for a decree in conformity with this opinion.*