## HARRY GRAUEL v. PETER L. ROHE

[No. 55, January Term, 1945.]

122

*Decided June 28, 1945.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and MARKELL, J.J.

*J. B. Randol Carroll,* with whom were *Charles Ruzicka* and *Cornelius V. Roe* on the brief, for the appellant.

*George M. Berry,* with whom was *Elmer R. Haile* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

Peter L. Rohe (appellee) and his wife own a farm in Baltimore County, as tenants by the entireties. It is situated at Baldwin, consists of one hundred and sixty acres of land, improved by a dwelling house, and outbuildings, equipped with stock, machinery, and farming implements. The appellee operated the farm. He, his wife and son lived on the place and the son, at times, assisted

in its operation. The son is married and a law student. Grauel (appellant) conducts a store and lives in Baltimore County. Young Rohe's wife worked there, and Rohe, Jr., worked for appellant in the evenings.

Appellant became interested in the farm, and went to see it. Appellee showed him the place and its lines, and he concluded to buy it, together with all the stock and farm equipment. In December, 1943, appellant gave two checks to appellee, each for the sum of $500. He took a receipt for these checks, which was written out and signed in the name of Peter L. Rohe by his son. The testimony shows that the purchase price for the farm was $20,000 and one of the checks was applied to that account. It also shows that the personalty was sold for $11,412.25 and the other $500 check was applied to this item. We think this agreement possessed the elements of an entire contract. It included the sale of both the farm and personalty, and not a separate and distinct sale of the farm or personalty. Appellee agreed to farm the place for appellant. He testified he was to remain on the farm a year. For three weeks he rendered an account to appellant, showing the receipts and expenses in the operation of the farm. The sale of the farm was not consummated and this suit was brought by the appellant to recover the down payments of $500 on the real estate and $500 on the personal property. The *narr* contains two of the common counts: (1) For money received by defendant for use of the plaintiff, (2) and for money found to be due from the defendant to the plaintiff on an account stated between them. The account filed with the narr is: "For money delivered to Peter L. Rohe by Harry Grauel on or about the 10th day of December, 1943, the return of which was demanded by Harry Grauel on or before the 29th day of February, 1944." The response to the demand for particulars of the plaintiff's claim is: "the money was delivered to Peter L. Rohe in connection with the proposed purchase of real estate and personal property"; and "the return of the money was demanded because no final agreement was reached."

The case went to trial on the *narr* as particularized under the general issue plea. Trial was before the court, without a jury, a verdict entered in favor of the defendant, and from a judgment entered thereon for the defendant, with costs, the case comes here on appeal.

The points posed by the appellant are: 1. That the record does not show an enforceable agreement for the purchase of the property mentioned in the evidence: 2. That any agreement for the purchase and sale of the property mentioned in the record was mutually abandoned by the parties to this case. Appellant contends that there was no such memorandum within the requirements of the statute of frauds and hence the agreement relied on is unenforceable. It is also urged there is no evidence to show part performance sufficient to take "the alleged agreement out of the operation of the statute of frauds." In the view we take of the case, it is unnecessary that we go into a discussion of those questions.

It is not unlawful to make a verbal contract for the sale of land, although it is quite true that such a contract cannot be proved by oral testimony and must be evidenced by a written contract as contemplated by the statute of frauds if demanded by the seller. That act is primarily evidentiary. Its purpose is to prevent fraud, and the provisions of the statute, accordingly, limit its use to that purpose. It cannot be used to perpetrate a fraud. If appellee had relied on the statute, appellant would have been relieved from all obligations under the agreement for the purchase of the farm and personal property. The evidence clearly shows that appellee waived the statute, and had no intention whatever of interposing it in the matter, and appellant, under such circumstances, cannot call up the statute in order to enable him to recover by his own breach of his agreement.

"According to the great weight of authority, the vendee, under an agreement for the sale and purchase of land which does not satisfy the statute of frauds, cannot recover back payments upon the purchase price if the vendor has not repudiated the contract but is ready, will-

ing, and able to perform in accordance therewith, even though the contract is not enforceable against the vendee either at law or in equity. Under this rule, one who has paid money in consideration of an oral contract cannot rescind such contract and recover the money paid unless the other party insists upon the statute and refuses to perform it on his part." 49 Am. Jur. *Statute of Frauds* 870, Sec. 564. 37 C. J. S., *Frauds, Statute of,* Sec. 256, p. 779.

"It does not follow, however, that to refuse plaintiff a recovery will be to enforce the contract in violation of the statute. The defendant is not in default; he tendered his deed properly executed, was ready and willing to perform, but was prevented from doing so by plaintiff's refusal to pay the full purchase price and accept the deed. The plaintiff is in the position of a vendee seeking to recover back purchase money paid on an unenforceable oral contract, which he alone is unwilling to carry out because he wishes to rescind it." *Roberts v. Roesch,* 306 Pa. 435, 159 A. 870, 871.

"The agreement was not illegal. There was no objection in law to complete performance by both parties. Money paid in performance in part even of an oral contract for the purchase of land cannot be recovered if the vendor is willing to convey on the performance of the conditions by plaintiff." *Keystone Hardware Corporation v. Tague,* 246 N. Y. 79, 158 N. E. 27, 28.

With these authorities we are in full accord.

Appellant cites *Colonial Park Estates v. Massart,* 112 Md. 648, 77 A. 275, to sustain his contention that no final agreement was reached in this case. There, the purchaser was shown by the agent of the seller a printed form of contract, and a contract under the terms therein contained was to be furnished him for execution. The next morning a contract was presented to the purchaser, containing "several very material provisions imposing additional burdens and restrictions upon the lots".

*Thompson v. Killheffer,* 99 N. J. Law 439, 125 A. 11, 12, is also cited by appellant. The purchaser in that case

paid to a real estate agent $500 to apply on the purchase price of a farm, including farming tools and furniture. The price was $15,000, one-half to be paid in cash and one-half by way of mortgage. A receipt was given by the real estate agent to the prospective purchaser. The day after, the purchaser advised that he could not take the farm. It was held in that case "that a real estate agent employed to sell has no authority, as such agent, by virtue of his employment, to enter into a binding contract for the sale."

These cases are not in point. In this case the contract was made directly between appellant and the appellee who owned the property together with his wife, as tenants by the entireties. There is nothing in the evidence to show that either party intended to enter into a more formal written contract. Appellee was ready, willing, and able to perform his agreement.

It is suggested that the agreement between the parties cannot be enforced because the property is held by appellee and his wife as tenants by the entireties. A husband can act as the agent of his wife in such transactions.

"If he acts with her authority, either expressly or impliedly conferred upon him, his acts are binding upon her; and 'she may also render his unauthorized acts as her agent binding on her by subsequent ratification which under the principles of agency is equivalent to original authority.' " *Kvedera v. Mondravitzky,* 145 Md. 260, 264, 125 A. 591, 593.

In *Safe Deposit & Trust Co. v. Strauff,* 171 Md. 305, 316, 189 A. 195, 199, the Court quoted with approval 21 *Ruling Case Law,* page 858, paragraph 36, which is, in part, as follows:

"As against one who has assumed to act as the agent of another the presumption is that he had authority to do the acts in question."

In this case the wife of appellee was not called by him as a witness. She did not repudiate the agreement, but was apparently entirely in accord with her husband in retaining the one thousand dollar part payment for the

farm and the personalty. She was therefore in agreement with her husband in his endeavor to sell both the farm and the personalty to appellant, and under the facts in this case she was bound by her husband's action in the matter.

The pivotal question in the case is: Was the agreement mutually rescinded by the parties? If one of the parties to a contract refuses to perform it " 'the other party thereupon has a choice of remedies. He may stand upon his contract, refusing assent to his adversary's attempt to rescind it, and sue for a breach, or in a proper case, for a specific performance, or he may assent to its abandonment, and so effect a dissolution of the contract by the mutual and concurring assent of both parties. In that event he is simply restored to his original position, and can neither sue for a breach or compel a specific performance, because the contract itself has been dissolved.' * * * In *Gunby v. Sluter,* 44 Md. 237, 250, it was held that a mutual recission of a contract for the sale of land entitled the vendees to the return of the purchase money paid, 'and no express promise was necessary.' * * * In *Restatement, Contracts,* Sec. 222, it is said that a contract within the statute of frauds may be orally rescinded 'unless the prior contract is enforceable and the contract to rescind involves the retransfer of some subject-matter which is within the Statute.' But there is adequate support for the conclusion that parol evidence is admissible to prove such a recission by mutual abandonment involving an actual and accepted re-delivery of possession. * * * In *Herzog v. Sawyer,* 61 Md. 344, it was held that a waiver of performance, or the abandonment of an agreement under seal may be proved by parol evidence." *Gibula v. Sause,* 173 Md. 87, 92, 194 A. 826, 828.

"The rule, generally stated, is that a contract may not be rescinded except by the mutual consent of both parties. * * * If the contract had been abandoned, this payment should have been returned. * * * And the proof must be clear and positive in order to establish the rescission, cancelation, or abandonment of the agreement."

*Loughran v. Ramsburg,* 174 Md. 181, at page 186, 197 A. 804, at page 807.

It is not necessary to quote authorities from other States, as the law announced by this Court is clear. It was legally competent for the parties to the agreement here considered to mutually abandon and rescind the same, "and the proof must be clear and positive in order to establish the rescission, cancellation, or abandonment of the agreement."

In the lower court the appellant offered two witnesses, namely, himself and his wife. Appellee offered two witnesses, the appellee and his son, who is called in the evidence "Louis." The proof establishes the fact of the giving of the checks and the taking of the receipt by appellant, already referred to. He did not intend to personally farm the place, and apparently, at the time of the giving of the receipt, appellee agreed to farm the place for appellant for one year. Such is the appellee's testimony. And for farming the place appellee was to get one-third of the profits, one-third was to be applied to expenses, and the appellant was to receive the balance of the profits of the farm. Appellant contends there was no final agreement and appellee, pending such agreement, was to render to him an account showing profits and losses in the operation of the farm, the inference being that he wanted to give these statements consideration before he entered into a final binding agreement. He did agree to pay appellee's son $20 a week. He signed the checks and took the receipt without seeing appellee's books showing farm accounts, and without requiring him to exhibit income tax returns. He seems to have contented himself with going over, in a perfunctory way, slips which appellee had on file showing sales to wholesale dealers in farm products. Accounts for a period of about three weeks were rendered by appelee to appellant, showing the profits and losses of the farm. These accounts seem to have cooled appellant's ardor to purchase the farm. From the whole testimony we are of opinion that appellant treated the agreement to purchase, the giv-

ing of his checks and the taking of the receipt therefore from the appellee, as a final agreement, and there is nothing in the testimony from which we can conclude that appellant treated the matter casually, but on the contrary he looked upon the agreement as a final one whereby he agreed to purchase the farm and personalty and the appellee agreed to sell the same. This is further confirmed by the fact that he shortly thereafter consulted Mr. Elmer R. Haile, a lawyer, for the purpose of having Mr. Haile search the title to the farm. Appellee was ready, willing and able to consummate the transaction. Appellant states that the reason he didn't go through with the agreement was: "Because Mr. Rohe wanted to leave the farm there, he was going to leave the farm and leave it in the hands of a colored man, and also wanted me to keep his son there to keep his draft status." The son was about twenty-three years old. Appellant testified that appellee didn't seem interested whether he took the farm or not and that appellee said: "It is perfectly satisfactory to me, I might just as well stay on the farm." He further testified as follows:

"Mr. Rohe was in our house in the evening and he was discussing the farm and said are you interested, and I told him no, I would let him know tomorrow. I didn't think I would be interested in taking over the farm. He said, well, that's perfectly all right to me. If you want it, all right; if you don't, just say so. I said I will let you know the following evening. He said I will know just how my son will stand then in regards to his draft status, and I called him the following evening and told Mr. Rohe I didn't care to take the farm, and he said, All right, Mr. Grauel, that's perfectly all right with me, and that was the end of the conversation. * * *

"Q. And that night after you all discussed it, did you call him up and tell him what your position was? A. Yes, I did. I called him the following evening and spoke to Mr. Rohe, and he said it was perfectly all right with him."

Mrs. Anna W. Grauel, wife of appellant, while on the stand was asked: "What did Mr. Rohe tell Mr. Grauel at that time? A. Mr. Rohe said, in leaving, he said, Mr. Grauel, I would like to know whether you intend to take the farm or not. He said, If you don't, it's perfectly all right with me, we will still be friends, and he said, As far as that—he said—I want to see that Louis is remaining at home with me if possible." She further testified that appellant told appellee: "he would call him up the following day to let him know his final answer whether he would take it. Mr. Rohe said that was perfectly all right with him, whether he took it or not."

Appellee testified that he and his son went to the store of the appellant and "asked him about it, and that's when he told me he didn't think he would go through with the deal. Q. What did you tell him? A. Well, I couldn't tell him nothing but, All right. I couldn't tell him no different. I couldn't make him go through with it." The son testified that he was present when appellant said he "wasn't going through with the deal," but he doesn't remember that his father told appellant that it would be "all right." Appellant, his wife, and appellee all testified that when appellant called off the agreement to purchase this farm appellee said "all right." That is appellee's testimony, and the son has no recollection that the father said "all right," but the father's recollection of the use of those words is clear. What did appellee mean when he told the appellant that it would be "all right" to call the deal off?

We are of opinion that when the appellee, in response to the appellant's statement to him that he was not going through with the agreement, said "all right" that the contract was abandoned, and rescinded. The expression "all right" is one in common use and generally employed. As used here by appellee it connoted accord, agreement to rescind, an expression of satisfaction that the agreement in this case be abandoned and rescinded. Appellee cannot thereafter, in explanation of his use of the words

"all right," give evidence of a secret mental reservation in order to alter, change, modify or destroy the meaning of the language he employed. In our opinion the proof in this case is clear and establishes to our satisfaction that the agreement here involved was rescinded by the mutual consent of the parties thereto. Appellee contends that he did not intend to return to appellant the $1,000 paid under this agreement. He certainly did not tell the appellant this, nor give him any idea that he intended to retain what had been paid him under the agreement. He should have so advised appellant at that time, for if he had been told by appellee that this money would not be paid back we cannot say that the appellant would not have consummated the transaction.

Appellee asserts that appellant took over the operation of the farm after the agreement was entered into between them. We are not impressed with this contention. He did not leave the farm. He, his wife, and his son continued to live there and did actually operate the farm. There is evidence in the case that he told appellant that he did not care whether he went through with the agreement or not.

The appellee says he purchased, at appellant's request, some hogs for which he paid $200. Appellee testified that he was not told by appellant how many hogs he wanted—"just wanted a bunch of hogs," so he went out and bought $200 worth of hogs for the appellant. No itemized account of this purchase was rendered, nor was appellant informed from whom the hogs were bought. The appellant testified that appellee "went out and bought those pigs without my knowledge. I had no knowledge of that until I happened to come up and they were there. I gave no order to purchase the pigs. I said I would like to buy some pigs and he went out and bought them on his own knowledge." He further testified he "didn't know where the pigs came from or the pigs cost."

There can be no doubt that appellee still has the hogs, and we assume that he purchased them at the best price he could. We cannot, therefore, say that the appellant

was damaged or suffered a loss in the purchase of these hogs, because there is no evidence in the record that enables us to ascertain the damage resulting to appellee in the purchase of the same. The matter of such damage, if any, under the evidence in this case, is highly speculative, and Courts do not indulge in speculation. It is not clear from the record that this item was intended to operate as recoupment, or simply as evidence tending to show that the agreement was entered into as a present, subsisting contract. Be that as it may, the item cannot be allowed for the reasons given. We need not decide if it was a proper matter of recoupment under the facts in this case.

We are of opinion that the learned Judge below was in error in finding as a fact that there was no rescission of the agreement here involved. We think that abandonment and rescission of the agreement is clearly proved by the evidence in the record. The judgment below will, therefore, be reversed.

*Judgment reversed, judgment in favor of appellant against appellee for $1,000, with interest from this date, and costs.*