# WASHINGTON HOMES, INC. *v.* INTERSTATE LAND DEVELOPMENT COMPANY, INC. ET AL.

[No. 101, September Term, 1977.]

*Decided January 11, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Paul M. Nussbaum,* with whom were *Richard C. Daniels* and *Reichelt, Nussbaum, Brown & Topf* on the brief, for appellant.

*John Vanderstar,* with whom were *Stephen R. Mysliwiec, Covington & Burling, F. George Heinze* and *Mudd, Mudd, Munday & Heinze, P.A.* on the brief, for appellees.

ORTH, J., delivered the opinion of the Court.

This case stems from a contract dated 23 June 1972 (the Sales Agreement) for the sale and development of several hundred single family residential lots in Charles County, Maryland. The original vendor was Interstate Land Development Company, Inc. It was succeeded by Interstate General Development, Inc. Along the way, their interests under the Sales Agreement were obtained by St. Charles Associates, a limited partnership. The vendee was Washington Homes, Inc.[1] Disputes over the performance of the Sales Agreement led to litigation in the Circuit Court for Charles County. Interstate General Development, Inc. filed an action seeking a decree compelling Washington Homes, Inc. to perform by paying to it the purchase price of the property with interest. (Equity No. 3694). Washington Homes, Inc. countered with an action against Interstate Land Development Company, Inc. and Interstate General Development, Inc. praying that the vendors be compelled to perform under the Sales Agreement, to convey to it as many lots as the vendors were ready to deliver in accordance with the terms and conditions of the contract and to pay compensatory damages. (Equity No. 4098).

The Sales Agreement did not provide for the arbitration of disputes. On 13 February 1976, Interstate Land Development Company, Inc., Interstate General Development, Inc. and Washington Homes, Inc. executed an instrument (the Arbitration Agreement) whereby they agreed that, in lieu of the litigation pending in the Circuit Court for Charles County, they would submit to binding arbitration all of the disputes which had arisen as of that date from the terms and conditions of the Sales Agreement. By order of court issued 24 February 1976 upon stipulation, the pending actions were placed on the Stet Docket. In June 1976, the parties stipulated in writing that St. Charles Associates, which had obtained the interests

---

1. Interstate General Development, Inc. is sometimes referred to in the pleadings and other documents in the record before us as Interstate General Development Corporation, Inc.

Hereinafter "Interstate" refers to Interstate Land Development Company, Inc., Interstate General Development, Inc. and St. Charles Associates, collectively. "Washington" refers to Washington Homes, Inc. "Parties" refers to all of the four entities collectively.

of the original and successor vendors on 25 May 1976, would be bound under the Arbitration Agreement.

The American Arbitration Association constituted a panel of three neutral arbitrators.[2] They made an award after a full plenary hearing.[3] The heart of the award, specified in ¶6 to be "in full settlement of all claims submitted to this arbitration," was contained in ¶1 wherein it was declared that the Sales Agreement "between the parties, which was the subject matter of this arbitration, be rescinded and declared null, void and of no force and effect." [4]

Washington was not satisfied. It filed an action in the Circuit Court for Charles County against Interstate, the American Arbitration Association, and each of the three arbitrators, in which it sought to vacate the award. The court disposed of the case by granting a motion by Interstate for summary judgment and ordering the dismissal of the Bill of Complaint. Washington appealed to the Court of Special Appeals. On our own motion, we certified the case to us for review before decision by that court.

## I

The ultimate question is the propriety of the trial court's grant of Interstate's motion for summary judgment.

"In an action, a party asserting a claim ... or a party against whom a claim is asserted, may at any time make a motion for a summary judgment in his favor as to all or any

2. The panel comprised a patent lawyer, an accountant and "a real estate man."

3. The hearing was held on 1 July and 10, 13 and 17 September 1976 in the conference room of the American Arbitration Association in Washington, D.C. The transcript of the proceedings consists of 884 type-written pages. The award was undated but bears jurat dates of 19, 20 and 21 October 1976. It was forwarded to the parties under date of 22 October by the Tribunals Supervisor of the American Arbitration Association.

4. The award further provided that "Interstate Land Development Company, Inc./Interstate General Development, Inc., their successors or assignors," return within 60 days the sum of $384,618, which included the original deposit paid by Washington Homes, Inc. under the Sales Agreement and interest and other allowable costs, ¶2; that the pending suits be dismissed by appropriate proceedings, ¶3; and that the administrative fee and expenses of the American Arbitration Association and the fees for the remuneration of the arbitrators be borne by the parties equally, all to be paid as directed by the Association, ¶4 and ¶5.

part of the claim on the ground that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law." Maryland Rule 610 a 1. The summary judgment procedure is not a substitute for a trial, but a means by which the trial court may determine, summarily, whether a trial is necessary.

At the trial level, the court, in ruling on a motion for summary judgment, does not decide disputed facts, but decides whether any real dispute as to material facts exists. *Lipscomb v. Hess*, 255 Md. 109, 118, 257 A. 2d 178 (1969). "The judgment sought shall be rendered forthwith if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Maryland Rule 610 d 1. "Conversely, if there is a genuine dispute as to any material fact, summary judgment would not properly be granted." *Brown v. Suburban Cadillac, Inc.*, 260 Md. 251, 255, 272 A. 2d 42 (1971). "[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact." *Fenwick Motor Co. v. Fenwick*, 258 Md. 134, 138, 265 A. 2d 256 (1970), and cases therein cited. The function of the trial judge is much the same as that which he performs at the close of all the evidence in a jury trial when motions for directed verdict or requests for peremptory instructions require him to determine whether an issue requires resolution by a jury or is to be decided by the court as a matter of law. *Lynx, Inc. v. Ordnance Products*, 273 Md. 1, 8, 327 A. 2d 502 (1974); *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 41, 300 A. 2d 367 (1973).

A court cannot rule summarily as a matter of law until the parties have supported their respective contentions by placing before the court facts which would be admissible in evidence. *Rooney v. Statewide Plumbing*, 265 Md. 559, 563-564, 290 A. 2d 496 (1972); *Shatzer v. Kenilworth Warehouses*, 261 Md. 88, 95, 274 A. 2d 95 (1971); *Brown v. Suburban Cadillac, Inc.*, 260 Md. at 255. " '[W]hen the moving

party has set forth sufficient grounds for summary judgment, the party opposing the motion must show with some precision that there is a genuine dispute as to a material fact.'" *Shatzer* at 95 (quoting *Brown* at 255). "A bare allegation in a general way that there is a dispute as to material facts is never sufficient to defeat a motion for summary judgment. ... General allegations which do not show facts in detail and with precision are insufficient to prevent the entry of summary judgment." *Lynx, Inc.* at 7-8. A material fact is one "the resolution of which will somehow affect the outcome of the case." *Rooney* at 564.

How each opposing party may place before the court facts necessary to the determination of a motion for summary judgment is explained in Maryland Rule 610 and the cases applying the Rule. In *Vanhook v. Merchants Mut. Ins. Co.,* 22 Md. App. 22, 26-27, 321 A. 2d 540 (1974), the Court of Special Appeals pointed out that some of the ways to place facts before the court were by affidavit, Maryland Rule 610 a 3; *Davis v. Montgomery County,* 267 Md. 456, 298 A. 2d 178 (1972); by deposition, Maryland Rules 400-413; *White v. Friel,* 210 Md. 274, 123 A. 2d 303 (1956); by answers to interrogatories, Maryland Rule 417; by admission of facts, Maryland Rule 421; by stipulation or concession; by pleadings, *Melbourne v. Griffith,* 263 Md. 486, 283 A. 2d 363 (1971); *Vanhook* at 27 explained:

"The function of pleadings in summary judgment cases is twofold:

"1. They serve to frame the issues, with respect to which the court must determine materiality.

"2. Allegations and the response, or lack of response, may establish facts as admitted or deemed to be admitted, for the purpose of the case. See, for example, Maryland Rules 311, 326, 342 c, 372."

In reviewing the propriety of the trial court's action on a motion for summary judgment, the appellate court is concerned with whether there was a dispute as to any material fact, and if not, whether the moving party was entitled to judgment as a matter of law. In considering the

matter, the duly shown facts which would be admissible in evidence and all reasonable inferences deducible therefrom must be considered in a light most favorable to the party opposing the motion and against the party making the motion. *See Rooney,* 265 Md. at 563-564; *Shatzer,* 261 Md. at 95; *Brown,* 260 Md. at 255.

II

Washington's Bill of Complaint To Vacate Arbitration Award and Interstate's Answer framed the issue whether, in providing in the arbitration award that the Sales Agreement "be rescinded and declared null, void and of no force and effect," the arbitrators exceeded their powers.[5] As we have indicated, the trial court decided the issue by granting Interstate's motion for summary judgment, and dismissing Washington's Bill of Complaint. The award thus stood affirmed.[6] In granting Interstate's motion for summary judgment the court said:

"By the parties having submitted to the arbitrators all of the issues which arose from each and all of the disputes concerning the Terms and Conditions of the Agreement for the Sale and Development of Lots, they granted to the arbitrators the power to determine to what extent, if any, that Agreement was enforceable and what relief, if any, should be granted.

"In determining liability under the contract the arbitrators would clearly have the power to determine if there would, in fact, be any liability. Thus, the enforceability of the contract would be a preliminary issue to be decided. Thus, the arbitrators' award deciding that the contract was unenforceable did not exceed their powers."

5. Section 3-224 (b) (3) of the Courts and Judicial Proceedings Article of the Maryland Code (1974) designates as one of the grounds for which an award shall be vacated that "[t]he arbitrators exceeded their powers."

6. "If an application to vacate is denied and no motion to modify or correct the award is pending, the court shall confirm the award." Section 3-226 of the Courts and Judicial Proceedings Article of the Maryland Code (1974). There was no motion to modify or correct the award pending in the case before us. *See* Nick-George Ltd. v. Ames-Ennis, Inc., 279 Md. 385, 368 A. 2d 1001 (1977).

Implicit in the grant of the motion was that the court determined summarily, as it may, that there was no genuine dispute as to a fact material to the issue. *Board v. John K. Ruff, Inc.,* 278 Md. 580, 594, 366 A. 2d 360 (1976). During the hearing on the motion it was suggested that there was no issue of fact; the matter was one of interpretation of documents which was a question of law for the court. The judge agreed: "I think that if it is determined that the arbitrators had the power to reach the award that they reached in this case, then I think that decides the motion for summary judgment." It was established by admissions in responses to allegations in Washington's Bill of Complaint To Vacate Arbitration Award that a Sales Agreement had been executed; that actions for specific performance of the Sales Agreement had been filed by each side in the Circuit Court for Charles County and docketed as Equity Nos. 3694 and 4098; that the parties agreed to binding arbitration and to place the pending specific performance actions on the Stet Docket; that the American Arbitration Association constituted a panel of neutral arbitrators to hear in arbitration issues raised by the parties; and that the arbitrators made an award which was forwarded to the parties under date of 22 October 1976. The pleadings, by attachments as exhibits, placed before the court the Arbitration Agreement, the stipulation and order to place the two specific performance actions on the Stet Docket, and the arbitration award. The Motion for Summary Judgment placed before the court by attachments as exhibits, the two bills of complaint for specific performance, which included as an exhibit the Sales Agreement. There was no dispute with respect to the existence or legality of these documents. With regard to the factual requisite for grant of summary judgment, we think that on the facts admitted through the pleadings and the documents placed before the court, Interstate as the moving party had set forth sufficient grounds for summary judgment, so that it was incumbent upon Washington to show in detail and with precision that there was a genuine dispute as to a material fact. To do so, Washington submitted an affidavit by Lawrence M. Breneman, its President. Breneman

made the bare allegation "that there is a genuine dispute as to material facts as such facts are set forth in [Interstate's] Motion for Summary Judgment." This, of course, in itself, was not sufficient to defeat the Motion. He gave as specifics that Washington "submitted to arbitration only such Terms and Conditions as were labeled as such in [the Sales Agreement]." It is not disputed that it was certain of the terms and conditions of the Sales Agreement which were the subject of arbitration. He asserted that "such Terms and Conditions were the subject matter of specific performance litigation having been brought in the Circuit Court for Charles County, Maryland, in Equities numbered 3694 and 4098." This was admitted. He referred to attached copies of an exchange of correspondence between counsel for appellant and counsel for appellees, "which," he claimed, "further give clear evidence to the fact that the June 20, 1976 meeting, the same being a meeting wherein all principals agreed to submit certain matters to binding arbitration, produced an Agreement limiting arbitration to 'all of the presently outstanding issues.'" The Arbitration Agreement, executed 13 February 1976, provided *inter alia:*

> "That each and all of the disputes having arisen, as of this date, from different interpretations of the Terms and Conditions of the [Sales Agreement] be submitted to binding arbitration. . . ."

It is manifest that the correspondence is not at odds with the Arbitration Agreement. The affidavit concludes:

> "That at no time did I enter into any agreement or authorize any one on behalf of Washington Homes, Inc. to submit to binding arbitration matters that were not in dispute as of the date of the Agreement dated February 12, 1976, and that, furthermore, neither Washington Homes, Inc. nor Interstate Land Development Company, Inc. and/or Interstate General Development, Inc. at any time prior to February 12, 1976, alleged or averred that the heretofore mentioned June 23, 1972 Agreement was null and void."

There was no allegation by Interstate that Breneman entered into any agreement or authorized anyone on behalf of appellant to submit to binding arbitration matters that were not in dispute as of the date of the Arbitration Agreement, nor did Interstate claim, as far as the record before us discloses, that at any time prior to [13] February 1976, they alleged or averred that the Sales Agreement was null and void. Thus, to this point in the determination of the propriety of the grant of the Motion for Summary Judgment, we find no genuine dispute as to any material fact which would bar the grant of the Motion. We turn, therefore, to the second requisite that Interstate be entitled to judgment as a matter of law.

## III

The parties by written contract duly executed agreed to submit certain disputes "to binding arbitration before an Arbitration Panel to be constituted through the American Arbitration Association" and "to be bound by the terms of the award, as is to be issued, by the Arbitration Panel aforesaid." [7] Pursuant to the agreement, the American Arbitration Association constituted a panel of neutral arbitrators at the request of the parties. The parties participated in a plenary hearing conducted by the arbitrators in the conference room of the office of the American Arbitration Association, following which the arbitrators issued an award. The award provided that the administrative fee and expenses of the Association and the fees for the remuneration of the arbitrators, to be borne by the parties equally, "shall be paid as directed by the Association." [8] It is manifest that by their agreement and their effectuation of the arbitration, the parties "provided for arbitration by the

7. As we have indicated, Interstate Land Development Company, Inc., Interstate General Development, Inc. and Washington Homes, Inc. executed the Arbitration Agreement. After St. Charles Associates acquired the interests of Interstate Land Development Company, Inc. and Interstate General Development, Inc. it became bound under the Arbitration Agreement by a stipulation executed by the parties.

8. The propriety of this is not questioned. We note that appellant in its Bill of Complaint to Vacate Arbitration Award prays that the court remand the matter "to the American Arbitration Association ... to Arbitrators" for further proceedings.

American Arbitration Association." They thereby made the Commercial Arbitration Rules of the Association a part of their arbitration agreement.[9] Section 42 of the Rules provides:

> "The Arbitrator may grant any remedy or relief which he deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract."

As it is implicit that the arbitrators here deemed just and equitable the relief and remedy they granted, the question is whether the relief and remedy was "within the scope of the agreement of the parties."

The introductory clauses of the Arbitration Agreement referred to the Sales Agreement, observing that it did not call for binding arbitration in the event any disputes arose therefrom, noted the pending actions for specific performance and alleged that "each party hereto has agreed that, in lieu of litigation in the Circuit Court for Charles County, Maryland, as aforesaid, that the parties enter into binding arbitration." The parties then agreed, for good and valuable considerations specified, to submit to binding arbitration certain matters which they designated, as we have indicated, to be "each and all of the disputes having arisen, as of this date [13 February 1976], from different interpretations of the Terms and Conditions of the [Sales Agreement]...." The Arbitration Agreement did not precisely delineate the disputes which had so arisen as of 13 February 1976. At the arbitration hearing, however, the parties made clear what disputes were within the contemplation of the Arbitration Agreement.

---

**9.** "The parties shall be deemed to have made these Rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association or under its Rules." Commercial Arbitration Rules of the American Arbitration Association, § 1. *See* Atlas Floor Covering v. Crescent House & Garden, Inc., 166 Cal. App. 2d 211, 333 P. 2d 194 (1958); SCM Corp. v. Fisher Park Lane Co., 40 N.Y.2d 788, 358 N.E.2d 1024, 390 N.Y.S.2d 398 (1976); National Equip. Rental Ltd. v. American Pecco Corp., 35 App. Div.2d 132, 314 N.Y.S.2d 838, *aff'd,* 28 N.Y.2d 639, 269 N.E.2d 37, 320 N.Y.S.2d 248 (1970); De Laurentiis v. Cinematografica De Las Americas, S.A., 9 N.Y.2d 503, 174 N.E.2d 736, 215 N.Y.S.2d 60 (1961).

Before the trial court, by way of exhibits to Interstate's Motion for Summary Judgment, were two documents entitled respectively "Contention of Interstate Land Development, Inc. and Interstate General Development, Inc., its Successor" and "Position of Washington Homes, Inc." Also attached as exhibits to the Motion were transcriptions of portions of the proceedings at the arbitration hearing. The documents asserting the contentions of Interstate and stating the position of Washington were submitted to the arbitrators at the hearing and referred to when the panel inquired of Interstate and Washington "what you [do] agree to be the issues and what you do not agree to be the issues," so the panel could "get one, two, three what the issues are." Interstate, attaching a copy of the Sales Agreement and quoting the clause contained in the Arbitration Agreement regarding the submission of disputes, listed eight contentions, the first seven making a specific reference to appropriate provisions of the Sales Agreement. Contention IV was:

> "The Agreement provides the lots shall be conclusively presumed complete and that settlement shall occur within a given time after seller's engineer certified to both Interstate and Washington Homes that the lots are developed in accordance with the contract specifications. This has been done and Washington Homes has refused settlement and has contested the certification;
>
>> "Interstate contends that Washington Homes can not contest the certification of the agreed upon and qualified third party.
>
> "[See: General Terms and Conditions-Paragraph 4]"

Contention V was:

> "The Agreement calls for the lots to be developed to FHA specifications. Washington Homes interprets this to mean that Interstate will be responsible for getting FHA approval of the lots;
>
>> "Interstate contends the contract specific-

ally requires FHA specifications, not FHA approval.

"[See: General Terms and Conditions-Paragraph 2(h)]"

Contention VIII was:

"When Washington Homes refused to settle on the lots certified completed, that action was a substantial breach of the contract and worked as an unusually harsh economic hardship on Interstate, during a particularly difficult economic period.

"Interstate contends that Washington Homes must reimburse Interstate for hardship it suffered and the additional costs. to it for the Washington Homes delays or in the alternative *Interstate contends that the equities demand the contract be rescinded in its totality."* (Emphasis added).

Washington's statement of its position did not designate the disputes with such specificity. As the panel observed, its "positions were just kind of generally stated." Washington's statement indicated, however, dispute with fundamental contentions of Interstate. Washington's third "entitlement" was "[t]hat settlement on any or all of the lots [involved] is not to occur until such time as Washington Homes, Inc. has been given assurances by the Department of Housing and Urban Development that the Federal Housing Administration will insure mortgage loans to be placed by ultimate purchasers from Washington Homes." By its fifth "entitlement" it sought interest on its cash deposit "until the date that Interstate can prove that it proceeded on a timely basis with the provisions set forth in paragraph 2 of the General Terms and Conditions," which dealt with FHA specifications. Significantly, Washington claimed that the Sales Agreement "is very much in effect," patently indicating it disputed Interstate's contention that Washington had breached the contract so as to be entitled to its rescission. On the basis of the two position statements and argument of counsel, the panel concluded, correctly we believe, that "there

is a question of repudiation of a contract by Interstate and by Washington Homes . . . both sides." This was in full accord with Interstate's claim throughout the hearing. At the very beginning they declared: "We contend that Washington Homes, without justification, repudiated a contract under which they were to buy, and Interstate was to sell, two hundred and fifty-three lots in Charles County, Maryland." They pursued this contention consistently. "[T]he proceeding here is, did Washington Homes, without justification, repudiate the contract, and if so, what are the consequences that follow from that? . . . The key issue, as far as we are concerned, and as far as Mr. Nussbaum [counsel for Washington] is concerned, apparently, is whether they repudiated the contract or whether we did." "We are simply saying this. They rejected the lots when we tendered them. They . . . didn't want them. . . ." "It will be enough for the arbitrators to rule that Washington Homes committed a breach or repudiation or anticipatory breach — the terminology is not important, the concept is — in 1974 when it refused to accept the lots on the ground that FHA approval was a prerequisite. We think you should ule that that is not a valid interpretation of the contract. And that, accordingly, the contract is extinguished, expired, it is gone, it is dead." "[W]e urge that you find that Washington Homes repudiated the contract in the summer of 1974 and that the contract is at an end. It no longer has any force and effect. It imposes no obligations on either party. And neither party has to do anything, pay any money, take any action, it is all over, washed-up."

Washington's position did not appear to be contrary. It told the arbitrators: "The only issue in ligitation [when the suits for specific performance were filed] was the issue of 'Did or did not Interstate obligate itself under [the Sales Agreement] to obtain FHA sub-division approval before Washington Homes was obligated to acquire title to the property?' " It expressed "the hope . . . that this panel of the American Arbitration Association will issue an award that will clearly impose upon the Interstate Corporations, the absolute duty to deliver pursuant to the June 23, 1972 agreement, both . . .

lots [involved]." But, most significantly, it acknowledged that "as ·a matter of law [the arbitrators] have an absolute alternative of ... ruling that by virtue of a complete breach by Washington Homes this contract is totally dead. You also have the alternative of ruling that Interstate did, pursuant to this contract, as of a certain date, make itself ready to Washington Homes to deliver these lots." We think that it is beyond question that the parties placed the issue of the repudiation of the Sales Agreement squarely before the arbitrators.

It necessarily follows from the award that the arbitrators found that Washington had repudiated the contract. *See O-S Corp. v. Samuel A. Kroll, Inc.,* 29 Md. App. 406, 410-411, 348 A. 2d 870 (1975), *cert. denied,* 277 Md. 740 (1976). Interstate sought as a consequence of the repudiation that the contract be rescinded. They explained to the arbitrators: "[T]he relief that we are asking here, if our evidence is persuasive to the arbitrators, is not money damages against Washington Homes but simply that these lots be cleared from this contract ... so that Interstate will be free and be put back into the position that they were in in 1972 of attempting to market these lots for whatever price and on whatever terms and to whatever buyers the market situation will handle." "[T]he relief we're asking from the arbitrators is not money damages against Washington Homes. . . . [L]et's rule that the contract is torn up, so that the lots are now free and clear, and Interstate can do with them — including negotiating a new contract with Washington Homes — do with them what they will." Counsel for Interstate told the arbitrators: "We are not denying the existence of the [Sales Agreement]. . . . We are asking you to rule — and this is standard contract remedies that I learned and Mr. Nussbaum [Washington's attorney] learned from contracts professors — that if a party repudiates its obligations under the contract, it is permissible for a court, or in this case, the arbitrators to say, 'all right, the contract has now been broken completely and we declare that it is no longer binding on the parties.' That is a conventional contract remedy. Nothing in the Arbitration

Agreement, nothing in the pleadings in the court — which is not before you anyway — nothing at all exists that I know of that precludes you from coming up with that result." After Washington failed to perform, Interstate believed that it had three options which they pointed out to the arbitrators: "One would be to sue for specific performance. Sue, and ask the court to make the other party perform the contract. Another would be to treat the breach as a repudiation of the contract because it was perfectly clear that they were taking the position that we had to do something and we did not think we had to do it. Treat the breach as a repudiation of the contract and treat it as ended. The third option would be to go into court and sue for damages." It was Interstate's position that they had not exclusively and irrevocably elected specific performance as the remedy merely because they had sued for specific performance. "It was within Interstate's rights in September 1974 to sue for specific performance." Other options were not waived, they urged, by pursuing one at that time. "You are not stuck with whichever remedy you choose to pursue first."

The arbitrators asked, with reference to Interstate's position regarding rescission whether there was ever any tender made to Washington by Interstate "as far as a deposit . . . as of a certain date to rescind the contract." Counsel for Interstate replied: "It is not in evidence and I hesitate to respond, but I am sure Mr. Nussbaum will agree that there is a clause in the contract that says that any lots that are not taken down two years after they are due to be certified, the contract expires. Pursuant to that, there was a tender of return of the deposit as to those first group of lots, 177 I think. That tender was refused." Washington's counsel did not evidence disagreement with that statement. Counsel for Interstate added: "I am not relying on that as part of my case. Obviously if the arbitrators rule that the contract is at an end, we will return the deposit with interest to Washington Homes." Throughout the hearing, Interstate expressed its willingness "to compensate [Washington] by interest for the fact that we have been holding [the deposit] for four years." Interstate took no position on whether the interest should run

from the date of the deposit or from the date of the breach. "We will give them back their deposit with interest at whatever is the fair rate and dating from whatever is the fair time. And that is the end of it."

IV

The law of this State is in substantial accord with Interstate's view. "Where ... there has been a material breach of a contract by one party, the other party has a right to rescind it." *Plitt v. McMillan,* 244 Md. 450, 454, 223 A. 2d 772 (1966); *Foster-Porter Ent'prises v. De Mare,* 198 Md. 20, 36, 81 A. 2d 325 (1951); *Vincent v. Palmer,* 179 Md. 365, 373-374, 19 A. 2d 183 (1941); *Ady v. Jenkins,* 133 Md. 36, 38-39, 104 A. 178 (1918). The general rule, as Interstate recognized, is "that one who seeks to rescind a contract or to have equity rescind it must restore to the other party the consideration that was given by that party. . . ." *Funger v. Mayor of Somerset,* 244 Md. 141, 151, 223 A. 2d 168 (1966); *Kemp v. Weber,* 180 Md. 362, 365-366, 24 A. 2d 779 (1942). Repudiation of a contract by one party gives the other party a choice of remedies. *Grauel v. Rohe,* 185 Md. 121, 127, 43 A. 2d 201 (1945); *Gibula v. Sause,* 173 Md. 87, 92, 194 A. 826 (1937). The filing of a suit by Interstate seeking specific performance did not constitute an irrevocable election of that remedy in the circumstances. We said in *Shoreham v. Randolph Hills,* 269 Md. 291, 299, 305 A. 2d 465 (1973):

"The law pertaining to the doctrine of election of remedies is quite technical. To compel a litigant to select among his remedies frequently is onerous. This makes the doctrine a severe one and a court should not strain to employ it or seek to extend lightly its applicability. Rather, it 'should only be applied to actions taken by the same litigant which are necessarily inconsistent.' *Petillo v. Stein,* 184 Md. 644, 652, 42 A. 2d 675 (1945). The function of this doctrine is to estop a plaintiff 'from ignoring the judgment rendered, changing his position and adopting the remedy he had repudiated and

repudiating the one he had adopted. He is not at liberty "to again vex the same defendant with another suit in a different form of action for the identical demand." ' *Travelers v. Nationwide,* 244 Md. 401, 416, 224 A. 2d 285 (1966); *Bolton Mines Co. v. Stokes,* 82 Md. 50, 59, 33 A. 491 (1895). *See generally* 25 Am. Jur. 2d, *Election of Remedies,* §§ 1-7 (1966); 28 C.J.S., *Election of Remedies,* §§ 1-3 (1941). Therefore, if one claim or remedy is pursued to judgment an inconsistent claim is thereafter barred."

*See generally* 12 Williston on Contracts §§ 1454A-1455 (3rd ed. 1970).

### V

We think that the arbitration award was authorized. We conclude that the arbitrators did not exceed their powers in declaring the Sales Agreement rescinded. In the circumstances, such action was within the scope of the agreement of the parties and, thus, constituted a remedy and relief which was authorized by § 42 of the Commercial Arbitration Rules of the American Arbitration Association deemed part of the Arbitration Agreement. We find that in light of what transpired at the arbitration hearing as shown by the portions of the transcript of the proceedings placed before the trial court, the admissions by responses to the pleadings, the stipulations and the affidavits on file, and the findings of the arbitrators, that there was no genuine dispute as to any material fact with respect to the action to vacate the award. Interstate was entitled to a judgment as a matter of law. Therefore, the trial court did not err in granting Interstate's Motion for Summary Judgment.

*Judgment affirmed; appellant to pay costs.*