CHESAPEAKE FIBER PACKAGING
CORPORATION, Plaintiff,

v.

SEBRO PACKAGING CORPORATION,
Defendant.

Civ. No. H–91–767.

United States District Court,
D. Maryland.

April 21, 1992.

Peter H. Gunst and Frank, Bernstein, Conaway and Goldman, Baltimore, Md., for plaintiff.

Francis J. Gorman, Wendell Finner and Semmes Bowen and Semmes, Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, Senior District Judge.

The parties in this case dispute the ownership of a patent. The material facts are not in dispute, and both plaintiff and defendant have moved for summary judgment.

The plaintiff is Chesapeake Fiber Packaging Corporation (hereinafter "Chesapeake"). In its complaint seeking declaratory and injunctive relief, Chesapeake has named as defendant Sebro Packaging Corporation (hereinafter "Sebro"). Plaintiff Chesapeake seeks a judicial determination that it is the true owner of U.S. Patent No. 4,988,022 (hereinafter "the '022 Patent" or "the Patent") and a permanent injunction prohibiting defendant Sebro from taking any action inconsistent with Chesapeake's ownership interest in the Patent. Defendant Sebro in turn contends that it was the owner of the application for the Patent and that it thereby succeeded to the ownership of the Patent itself which was later issued to Chesapeake. The sole issue for the Court to decide is which party is the owner of the Patent.

Responding to the complaint, defendant Sebro has filed an answer and a counterclaim. In its counterclaim, defendant Sebro seeks a declaration that plaintiff Chesapeake is not the true owner of the '022 Patent, and Sebro has asked the Court to permanently enjoin Chesapeake from doing anything inconsistent with Sebro's ownership of the Patent.

Pursuant to a Scheduling Order and later a Revised Scheduling Order entered by the Court, the parties have engaged in discovery, including the taking of a number of depositions. Following the close of discovery, cross-motions for summary judgment were filed by the parties. Memoranda and numerous affidavits, depositions and exhibits in support of and in opposition to the pending motions have been submitted by the parties and reviewed by the Court. Oral argument has been heard in open court. For the reasons to be stated herein, plaintiff's motion for summary judgment will be granted, and defendant's motion for summary judgment will be denied.

## I

### Facts

Both Chesapeake and Sebro are engaged in the business of manufacturing and converting paper products, and both sell products used in the dry cleaning trade. In early 1988, both Chesapeake and Sebro were manufacturing and selling products to the Packaging Division of Majestic Industries, Inc. (hereinafter "Majestic"). Majestic in turn made sales to the dry cleaning trade. The dispute at issue here arose when Majestic filed for bankruptcy in 1989.

In 1987, Joel Seitz, Vice President of Sebro, invented a new fiberboard shoulder guard for use with wire coat hangers in the dry cleaning business. This product was marketed under the "POPS ON" name. Seitz showed his new shoulder guard to Irving Glassner, President of Majestic's Packaging Division. In the Fall of 1987, Glassner and Seitz began to discuss the marketing and patenting of Seitz's shoulder guard. Glassner wanted exclusive rights to sell and distribute this new product. Sebro offered to manufacture the shoulder guard for Majestic on an exclusive basis. By the Spring of 1988, Majestic and Sebro had reached an agreement whereby Majestic would market and promote the shoulder guard as "POPS ON" and would bear the expense of seeking a patent on the invention, while Sebro would manufacture the product for Majestic and would assign all rights in the invention to Majestic.

In accordance with the agreement between the parties, Majestic engaged the New York City law firm of Lieberman, Rudolph & Nowak (hereinafter the "Lieberman law firm") to prosecute the application seeking a patent for the "POPS ON" invention. The application (hereinafter the "Patent Application") was filed in the United States Patent and Trademark Office (the "PTO") on May 5, 1988. Joel Seitz was named as the applicant. During the year 1988, the Lieberman law firm took steps to prosecute the Patent Application.

On July 13, 1988, two formal documents were executed transferring rights in the invention from Sebro to Majestic. First, Seitz, as inventor, executed a written Assignment dated July 13, 1988, which assigned to Sebro "all the rights and privileges under any and all Letters Patent that may be granted therefor." Sebro then, by

written Agreement also dated July 13, 1988 (hereinafter "the Agreement" or "the 1988 Agreement"), assigned all of its right, title and interest in the invention to Majestic. In pertinent part, the Agreement provides:

Sebro hereby sells, assigns, transfers and sets over to Majestic its entire right, title and interest in, to and under the aforesaid Invention(s) and any and all Letters Patent that have been, or may hereafter be granted therefor in the United States of America and in all foreign countries where Majestic may elect, at its sole and exclusive option, to secure patent protection.

Sebro reserved to itself a royalty of $1.50 per each thousand units sold by Majestic. If Majestic utilized Sebro to manufacture the product, however, the royalty fee would be "[b]uilt into" the sales price charged by Sebro. Sebro also agreed not to manufacture the "POPS ON" invention "or any product substantially similar to it" for anyone other than Majestic.

A key provision in the Agreement is Paragraph 10. That Paragraph permitted assignment of the Agreement to successors and assigns of the parties, contained an express integration clause, and permitted termination only for material breach following written notice and failure to cure within 90 days. Paragraph 10 specifically provides as follows:

This Agreement and the covenants herein contained, shall be binding upon, and inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto. It may not be changed, altered or modified except by written agreement signed by both parties. Any failure to insist upon strict performance shall not operate as a waiver for the future. This Agreement represents the entire understanding of the parties, and there are no representations, warranties, covenants or understandings except as expressly set forth herein. Either party may terminate for material breach upon the other's failure to cure after 90 days from written notice (sent overnight express) of the breach.

The Agreement contains no language imposing any obligation on Majestic to prosecute the Patent. Nevertheless, plaintiff does not dispute, for the purposes of the pending motions, that Glassner orally agreed to pay for the costs of prosecuting the Patent.

Following execution of the Agreement on July 13, 1988, Majestic elected to have Sebro continue to manufacture the "POPS ON" product, and the Lieberman firm continued to prosecute the Patent Application which had been filed on May 5, 1988.

In December of 1988, Majestic discontinued the business of its Packaging Division, which had marketed, sold and distributed the "POPS ON" product. About the same time, Irving Glassner and his son Benjamin left Majestic and accepted employment with Chesapeake. They took to Chesapeake with them Majestic's Packaging Division business, which included sales and distribution of "POPS ON" products to the dry cleaning industry. On December 22, 1988, Majestic's President, Charles Benjamin, sent a letter to the Glassners, which stated as follows:

This will confirm our many conversations wherein I advised you that Majestic Industries, Inc. will discontinue their Packaging Division effective December 31, 1988.

It is my understanding that you wish to join with Chesapeake Fiber Packaging Corporation and continue to work in the "Laundry Packaging Business" and perform the same functions and services that were heretofore performed by Majestic Industries, Inc. Packaging Division.

This letter expresses my acknowledgement and unconditional consent for you to join with Chesapeake Fiber Packaging Corporation and to continue in the "Laundry Packaging Business", calling on the same customers and performing those same or additional functions and services in the "Laundry Packaging Business", as were heretofore performed by Majestic Industries, Inc. Packaging Division.

Also on December 22, 1988, Irving Glassner telephoned Paul Kiselik, Sebro's President, from Chesapeake's offices and informed him that Chesapeake was continuing the business operations of Majestic's Packaging Division. After George Koehlert, Chief Operating Officer of Chesapeake, had assured Kiselik of Chesapeake's credit worthiness, Kiselik agreed that Sebro would continue to manufacture for Chesapeake the same products that it had previously manufactured for Majestic (including "POPS ON"). That same day, Kiselik accordingly agreed to ship to Chesapeake "POPS ON" and other products which were sitting on Sebro's floor awaiting delivery to Majestic. Kiselik insisted, however, on charging Chesapeake 15% more than Sebro had charged Majestic for all products covered by the agreement, including the "POPS ON" products. Chesapeake agreed to pay the new price, and to date, Sebro has realized over $798,000 in revenues from sales of the "POPS ON" products to Chesapeake.

Beginning in 1989 and through the middle of 1990, Sebro embossed the inscription "Chesapeake Fiber Corporation Patent Pending" on millions of "POPS ON" shoulder guards sold to Chesapeake.[1] Seitz himself has testified that he ordered the embossing dies and that Kiselik decided upon the wording that was placed on the dies. Sebro originally billed Chesapeake $150 for the cost of the embossing dies by invoice dated March 30, 1989. Thereafter, in late December, 1989 or early January, 1990, Chesapeake was billed $150 for the cost of a replacement die with the same inscription. On February 15, 1990, attorney John Santalone of the Lieberman firm advised Kiselik by letter that embossing a company name on a product "may infer ownership" of the patent. Nevertheless, Sebro continued to emboss the products with the legend "Chesapeake Fiber Packaging Corporation Patent Pending" for an additional five months.

After December of 1988, Majestic did not respond to letters received from the Lieberman law firm concerning the Patent Application. On January 8, 1989, the Lieberman law firm notified Majestic by letter that action was required in order to maintain the viability of the Seitz Patent Application. On January 10, 1989, attorney Arthur Lieberman of the Lieberman law firm wrote Majestic concerning its failure to pay attorneys' fees owed to the firm in connection with the Patent Application. Majestic never responded to these letters.

On February 9, 1989, Majestic filed in the United States Bankruptcy Court for the District of Maryland a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code. *In re Majestic Industries, Inc.*, Bankruptcy No.· 89–5–0406–JS. Majestic thereafter continued in possession of its property and managed its business as a debtor-in-possession pursuant to provisions of the Bankruptcy Code. *See* 11 U.S.C. §§ 1107 and 1108. No rights in the "POPS ON" product, in the Patent Application, or in the 1988 Agreement, were listed by Majestic in the schedule of assets which it filed with the Bankruptcy Court.

In March of 1989, the Lieberman law firm informed Majestic that an immediate response was required in order to prevent abandonment of the Seitz Patent Application. During a telephone conversation which occurred on March 20, 1989, a secretary at Majestic told the Lieberman firm to permit the Patent Application to be abandoned. The Lieberman law firm sent a letter of confirmation to Majestic, as follows: "This will confirm my conversation with your secretary, this date, in which she informed me that all Patent Applications, patents and trademarks are to be permitted to go abandoned."

On April 20, 1989, Seitz contacted attorney John Santalone of the Lieberman law firm to inquire about the status of the pending Patent Application. He was informed that the Patent Application would be abandoned unless various fees were paid and unless a response were made to a

---

1. The shoulder guards had previously been embossed: "Majestic Industries, Inc. Patent Pending."

pending PTO office action. By letter dated April 28, 1989, Kiselik agreed that Sebro would accept responsibility for paying fees of the Lieberman firm amounting to $2,780, if the firm were successful in obtaining the patent in Sebro's name.

Prior to Seitz's April 20, 1989 telephone call, the Lieberman firm had decided to stop work on Majestic matters and to seek recovery of fees due and owing by filing a claim in Majestic's Chapter 11 proceeding. Indeed, on April 18, 1989, the Lieberman firm filed its Proof of Claim in the sum of $4,515.01 in the bankruptcy case. This was the full sum which was then owed by Majestic, including $2,361 attributable to the '022 Patent Application.[2]

In 1987, Sovran Bank/Maryland (hereinafter "Sovran") extended credit to Majestic and as security had acquired a first lien on substantially all of the assets of Majestic. This lien specifically included any patents or contract rights then owned by Majestic or thereafter acquired. Sovran perfected its security interest in Majestic's assets by filing financing statements with the State of Maryland Department of Assessments and Taxation and with the Clerk of the Circuit Court for Cecil County, Maryland. In particular, the financing statements filed by Sovran specifically covered "[a]ll of the ... contract rights ... and patents now owned or hereafter acquired by the debtor [Majestic]." However, Sovran did not file with the PTO any notice of its security interest in Majestic's patent rights.

Majestic defaulted on its obligations to Sovran, and Sovran accordingly sought in the bankruptcy proceedings to exercise its rights as a secured creditor pursuant to its security interest in Majestic's assets.[3] On November 8, 1989, Bankruptcy Judge Schneider entered in Majestic's bankruptcy case a Consent Order,[4] which authorized Sovran, as Majestic's secured creditor, to repossess property of Majestic subject to Sovran's security interest. The Consent Order, provided in pertinent part:

Sovran may exercise its right to immediately repossess some or all of the Sovran Collateral in place and may simultaneously execute and deliver to the proposed buyer a secured creditor's bill of sale in the form attached hereto as Exhibit B; such secured creditor's bill of sale shall be sufficient to vest title to the subject Sovran Collateral described therein in the buyer, without further action or notice by any party, save only those ministerial actions necessary to evidence the passing of title in accord with the nature of the property sold. Such sale shall be reported to this Court, but shall not require further approval of this Court. One Hundred Percent (100%) of the proceeds of the sale or other disposition of the Sovran Collateral shall be paid to Sovran without deduction simultaneously with the closing of such sale or other disposition.

In April of 1990, the Lieberman firm completed its efforts to prosecute the Patent Application by submitting formal drawings and other documents. In that month, the law firm had received Sebro's check in the amount of $2,361.23, in full payment of Majestic's unpaid legal fees for work done in prosecuting the Patent Application. In the Verified Statement prepared by Sebro and submitted to the PTO, Kiselik swore that only Sebro, and no other individual, concern or organization, held any rights whatsoever to the Patent Application.

On May 1, 1990, Kiselik sent a letter to the "President" of Majestic claiming that Majestic was in default of the 1988 Agreement and that the Agreement would be terminated if the breach was not cured within 90 days. The full text of this letter is as follows:

Please be advised you are in default of the patent agreement dated July 13, 1988. Your breach is that we have received neither orders from you nor compensation. In fact, due to your bank-

---

**2.** Although Sebro had agreed to pay $2,780, it was later determined that the amount attributable to prosecution of the Patent Application was $2,361.

**3.** As of October 5, 1989, Majestic's indebtedness to Sovran amounted to some $14,900,000.

**4.** Both Majestic and Sovran agreed to the entry of this Consent Order.

ruptcy, you have refused to make payments to us and demanding [*sic*] moneys that were paid to us to be returned to you.

Unless the above is cured within ninety days, the agreement of July 13, 1988 is null and void.

In mid–1990, Sebro stopped embossing the "Chesapeake Fiber Packaging Corporation Patent Pending" impression on the "POPS ON" product and began marketing a similar shoulder guard product known as "Qwik–Shape."[5] Seitz conceded at his deposition that the "Qwik–Shape" product was covered by the "POPS ON" Patent.

On August 20, 1990, pursuant to the procedure set forth in Judge Schneider's Consent Order of November 8, 1989, Chesapeake purchased from Sovran the latter's interest in the 1988 Agreement, including rights in the Patent Application. A Creditor's Bill of Sale was executed, transferring Sovran's rights in the Patent Application to Chesapeake. On August 28, 1990, Chesapeake filed a "Revocation of Power of Attorney" with the PTO, substituting its patent attorney, Burton Amernick, as attorney of record for the Patent Application. On August 31, 1990, Amernick filed with the PTO a Request for Expedited Recordal of Assignment Documents and also filed the following documents asserting Chesapeake's claim of ownership of the Patent Application: (1) the July 13, 1988 assignment from Seitz to Sebro, (2) the July 13, 1988 Agreement between Sebro and Majestic, (3) the Bankruptcy Court's Consent Order of November 8, 1989, and (4) the Creditors' Bill of Sale from Sovran to Chesapeake of August 20, 1990.

On October 4, 1990, Chesapeake filed a petition with the Commissioner of Patents and Trademarks seeking to correct the Patent Application so as to identify Chesapeake as the assignee. In a decision dated November 6, 1990, Chesapeake's petition was granted.

On January 29, 1991, the PTO issued to Chesapeake U.S. Patent No. 4,988,022 entitled "Garment Hanger Shoulder Guard and Blank Therefor." Amernick immediately sent a copy of the Patent to Kiselik and demanded that Sebro cease its "Qwik Shape" infringement activities.

On behalf of Sebro, attorney Santalone of the Lieberman law firm responded to Amernick by letter dated February 6, 1991. Santalone stated that Chesapeake's listing as assignee "may be erroneous," and suggested that, "[u]ntil the ownership issue is resolved," Chesapeake should "not assert the patent against Sebro or any other entity." Following further correspondence between counsel, Chesapeake filed this civil action in this Court on March 22, 1991.

## II

### *Summary Judgment Principles*

It is well settled that a party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). This burden may be met by considering of affidavits, exhibits, depositions and other discovery materials. *Id.*

 One of the purposes of Rule 56 is to require the opposing party, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that factual issues exist requiring a trial. *See* Rule 56(e). Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick v. Celotex*, 736 F.2d 946, 958–59 (4th Cir.1984) quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967)). In the absence of such a minimal showing, a party moving for summary

---

**5.** During the pendency of this suit, Sebro placed an advertisement in the February 1992 issue of *American Drycleaner* magazine for "Qwik Shape." The advertisement identified the product by patent number 4988022, Chesapeake's patent number, and invited prospective customers to call "Qwik Pak" at "1–800–24PATENT."

judgment should not be required to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in *Bland v. Norfolk and Southern Railroad Company,* 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.,* any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two cases decided in 1986, the Supreme Court clarified the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson,* the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 477 U.S. at 250–51, 106 S.Ct. at 2511–12. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Catrett,* the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule.Civ.P. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984). . . . Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the, manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

The. Fourth Circuit has discussed the Supreme Court's holdings in *Anderson* and *Catrett.* In *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126 (4th Cir.1987), (quoting *Celotex, supra,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53), Judge Wilkinson emphasized that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* at 1128 (quoting *Celotex, supra,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53).

Applying these principles to the facts of record here, this Court has concluded that plaintiff's motion for summary judgment must be granted and that defendant's motion for summary judgment must be denied. Both plaintiff and defendant have moved for summary judgment, and the material facts are not in dispute. What is disputed is the application of the facts to the controlling principles of law.

### III

#### *Discussion*

On the record here, this Court concludes as a matter of law that plaintiff Chesapeake is the owner of the '022 Patent at issue in this case. The inventor assigned rights in the invention to Sebro which in turn assigned those rights to Majestic; Ma-

jestic's secured creditor Sovran repossessed these rights after Majestic had filed for bankruptcy, and Chesapeake purchased rights to the Patent Application from Sovran pursuant to a Consent Order entered by the Bankruptcy Court. The agreements at issue here are unambiguous on the dispositive issues, and this Court is therefore entitled to interpret the agreements and grant summary judgment because no interpretive facts are in genuine issue. *World–Wide Rights Limited Partnership v. Combe, Inc,* 955 F.2d 242, 245 (4th Cir. 1992). In view of the Court's conclusion that title to the Patent vested in Chesapeake as a result of its purchase from Sovran in 1990, it is not necessary for the Court to address Chesapeake's alternative argument that it acquired the patent rights by assignment from Majestic in 1988.

■ Chesapeake's title may be readily traced by reference to material facts which are not disputed. On July 13, 1988, Seitz, the inventor, duly assigned to Sebro his rights in the invention. That same day, Sebro validly assigned all of its right, title and interest in the invention to Majestic. Once Majestic came into ownership of the rights in and to the Patent Application, these rights became immediately subject to Sovran's lien, which specifically covered contract rights and patents acquired by Majestic after 1987. When Majestic's bankruptcy later ensued in 1989, Sovran, with the approval of the Bankruptcy Court, executed on the secured interest it held on property of Majestic and repossessed the patent application rights. Thereafter, Sovran sold the rights which it then owned in the Patent Application to Chesapeake. The PTO later issued the Patent to Chesapeake, which remains the owner. The issuance of the Patent to Chesapeake by the PTO established *prima facie* ownership in Chesapeake. *Electric Auto–Lite Co. v. P. & D. Mfg. Co.,* 78 F.2d 700, 704 (2d Cir.1935). Facts of record here reinforce this presumption and conclusively establish that Chesapeake is the owner of the Patent in suit.

In contending that the PTO erroneously issued the Patent to Chesapeake, Sebro argues: (1) that Sovran failed to file a notice of security interest with the PTO and therefore any security interest in the Patent Application was unperfected and void; (2) that Majestic in effect rescinded the 1988 Agreement with Sebro and abandoned its rights in the Patent Application, causing a reversion of those rights back to Sebro before Chesapeake's purchase from Sovran; (3) that the letter sent by Sebro to Majestic in May of 1990 claiming that Majestic was in default under the 1988 Agreement effected a termination of that Agreement before the Bankruptcy Court issued its Consent Order; (4) that Majestic's bankruptcy estate and Sovran are estopped from claiming any interest in the 1988 Agreement or in the Patent Application inasmuch as Majestic had failed to list the Agreement or the Patent Application as an asset in its bankruptcy schedules; and (5) that the 1988 Agreement was an executory contract which Majestic failed to assume in accordance with 11 U.S.C. § 365. After due consideration of these arguments, this Court has concluded that none of them have merit.

(a)

*Sovran's Security Interest*

■ Sebro first contends that Chesapeake's claim of title fails because Sovran did not validly perfect a security interest in the Patent Application. While Sovran filed financing statements with the Maryland State Department of Assessments and Taxation of Maryland and the Clerk of the Circuit Court for Cecil County, Maryland, it did not file any notice of its purported security interest with the PTO.

Insofar as the perfection of a security interest is concerned, the Maryland Code provides:

> This title does not apply (a) To a security interest subject to any statute of the United States, to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property.

Md.Comm.Law Ann. § 9–104.

35 U.S.C. § 261 constitutes a "statute of the United States which preempts state-law filing provisions in the regulation of securi-

ty interests in patents." Section 261 provides in pertinent part as follows:

> An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage.

35 U.S.C. § 261.

Sebro argues that "Sebro's payment of expenses for the prosecution of the patent application, made without knowledge of Sovran's unrecorded claim, renders Sebro a subsequent purchaser of the patent application, for valuable consideration without notice." In support of this questionable proposition, Sebro cites only *In re Transportation Design and Technology, Inc.*, 48 B.R. 635 (Bankr.S.D.Cal.1985). However, in that case the Court observed, *inter alia*, "that [the secured creditor] was not required to perfect its security interest in the pre-petition patent by filing or recording with the Patent Office in order to defeat the interests of the trustee." *Id.* at 638. The court explained:

> In the Court's opinion, *Waterman [v. MacKenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891)] stands for the proposition that a bona fide purchaser holding a duly recorded conveyance of the ownership rights in a patent or a mortgagee who has recorded its interest as a transfer of title with the Patent Office will defeat the interests of a secured creditor of the grantor or mortgagor who has not filed notice of its security interest in the Patent Office. However, the trustee is in the position of a hypothetical lien creditor, not a bona fide purchaser. As such, this dispute with [the secured creditor] can be governed by the Uniform Commercial Code provisions regulating competing claims against the patent without conflicting with the Patent Act's provisions protecting bona fide purchasers of the patent. Absent a clear conflict be-

tween the two provisions, the UCC provisions remain applicable.

*Id.* at 639.

It is clear from the record here that Sebro is not a *bona fide* purchaser for value of Majestic's patent rights. It therefore cannot rely on § 261 to defeat Chesapeake's title to the Patent. Sebro did little more than pay the amount owed by Majestic to its lawyers. This was done not pursuant to any agreement with Majestic, but rather to induce the Lieberman firm to attempt to secure title to the Patent in Sebro's name. Sebro could not purchase rights in the Patent Application from the Lieberman firm because the Lieberman firm never owned those rights. Sebro never obtained a written reassignment of the rights transferred to Majestic by the 1988 Agreement, nor did Sebro record any such reassignment with the PTO. *Bailey v. Chattem, Inc.*, 684 F.2d 386, 392 (6th Cir. 1982), holds that "recording does not affect the validity of a patent assignment except as to subsequent purchasers or mortgagees without notice."

■ This Court concludes that Sebro did not, by paying attorneys' fees owed to the Lieberman firm by Majestic, become a subsequent *bona fide* purchaser of rights in the Patent Application. Thus, the security interest assigned by Majestic to Sovran was valid and outstanding at the time that Sovran repossessed the patent rights and sold them to Chesapeake.[6]

#### (b)
#### *The Alleged Abandonment and Rescission*

■ The next question before the Court is whether Majestic abandoned the Patent Application in early 1989 and whether any such abandonment resulted in a rescission of the 1988 Agreement. Sebro argues that rights in the Patent Application reverted to it when Majestic abandoned the Application in early 1989. In response, Chesapeake contends that the 1988 Agreement could be terminated only with the approval of the

---

**6.** Sebro also attacks the validity of the sale of the patent rights to Chesapeake because the amount paid was only $8,000. However, the record indicates that the purchase price was agreed upon following good faith negotiations conducted by the parties.

Bankruptcy Court after timely compliance by Sebro with the notice and cure provision of the Agreement. This Court would agree.

Chesapeake concedes that a representative of Majestic at a time after commencement of the bankruptcy proceedings indicated an intention on the part of Majestic to abandon the Patent Application. However, no actual abandonment ever occurred. Without notifying Majestic or Chesapeake, Sebro undertook itself to have the Patent Application prosecuted by paying the outstanding bill of the Lieberman firm.

A patent statute provides that "[u]pon failure of the applicant to prosecute the application within six months after any action therein ... the application shall be regarded as abandoned by the parties thereto." 35 U.S.C. § 133. Pursuant to another provision of patent law, an applicant will be denied a patent if "he has abandoned the invention." 35 U.S.C. § 102. *See also USM Corp. v. SPS Technologies, Inc.*, 514 F.Supp. 213, 238 (N.D.Ill.1981), *vacated on other grounds*, 694 F.2d 505 (1982) ("subject matter once abandoned may not lawfully be resurrected and recaptured in a later filed patent application"). In this particular case, no abandonment ever occurred. Six months did not elapse after the last action taken by the Lieberman firm in 1988 and its resumption of the prosecution in early 1989.

Acceptance of Sebro's position that Majestic's alleged abandonment caused an immediate reversion of the Patent Application rights to Sebro would result in a determination that such an abandonment would constitute an automatic rescission of the Agreement even though there was no compliance with the notice provision. Sebro relies primarily on *Timoney v. Buck*, 84 F. 887 (2d Cir.1898), a one-page *per curiam* opinion of more than 90 years ago.[7] In that case, the inventor had entered into an "inartificially drawn" agreement to assign an interest in future patents to A.H. Newton & Bros. in exchange for Newton's express agreement to pay the expenses of prosecuting such patents. Having come to

the conclusion that the patent would be worthless, Newton subsequently refused to pay the expenses of prosecution, whereupon the inventor funded the prosecution himself. In an infringement action brought by the inventor, the earlier assignment to Newton was raised as a defense. The court held that Newton's failure to pay the expenses of prosecution constituted "an abandonment of the agreement so far as it related to the patent in suit." *Id.* at 888.

However, the facts of this case differ markedly from those presented in *Timoney*. Here, bankruptcy had intervened before the alleged abandonment occurred. Moreover, the 1988 Agreement could be terminated by a party only for a material breach and only by sending written notice and granting the other contracting party 90 days to cure the breach. No such provision was present in the *Timoney* case. *See Buck v. Timomy*, 78 F. 487 (1897). Nor was the assignee in that case in bankruptcy. In *Timoney*, the inventor did notify Newton of the breach and continued with prosecution of the patent only after the Newtons told him "that they would have nothing to do with obtaining it." 84 F. at 888. Here, by contrast, Sebro did not give notice to Majestic of the alleged breach until May of 1990, a date when Majestic was in bankruptcy, and when the Lieberman firm had already resumed prosecution of the Patent Application in Seitz's name. By giving written notice of an alleged breach in May of 1990, Sebro itself acknowledged that the Agreement required notice before it could be terminated. It is apparent that Sebro did not want to notify Majestic that it was attempting to obtain a reversion of the Patent Application rights until it believed that it had completed all steps necessary to continue prosecution of the Application. Sebro did not send Chesapeake a copy of its letter of May 1, 1990, even though it had recognized Chesapeake as Majestic's successor. Nor did Sebro ever inform Chesapeake of its attempt to obtain the patent rights, even though millions of "POPS ON" shoulder guards indi-

---

**7.** No more recent decision adopting the *Timo-* *ney* principles has been cited by Sebro.

cated that the patent was pending in Chesapeake's name.

Sebro relies on decisions of the Court of Appeals of Maryland in contract cases in arguing that Majestic's abandonment of the Patent Application effected a rescission of the Agreement. However, these cases indicate that any failure to perform on the part of Majestic would do little more than give Sebro the right to rescind. *See Grauel v. Rohe*, 185 Md. 121, 127, 43 A.2d 201 (1945); *Washington Homes, Inc. v. Interstate Land Development Co.*, 281 Md. 712, 728, 382 A.2d 555 (1978). Moreover, Maryland law provides that "[r]escission is a radical move, and the law exacts the election of that course to be asserted without wait." *Baumel v. Rosen*, 412 F.2d 571, 574 (4th Cir.1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 681, 688, 24 L.Ed.2d 681 (1970). Here, Sebro was required by the terms of the Agreement to provide written notice of termination or rescission of the Agreement and to give Majestic an opportunity to cure the default, and Sebro waited for more than a year after the alleged abandonment occurred to give such notice.

Sebro also points to two patent cases in support of its contention that rights in a patent application revert to the inventor/assignor when the assignee abandons the patent. *Pierpoint Boiler Co. v. Penn Iron & Coal Co.*, 75 F. 289 (N.D.Ohio 1896); *Union Switch & Signal Co. v. Day*, 16 F.2d 4 (2d Cir.1926). However, in both of these cases the agreement contained an express reversion or revesting clause, and no action by the assignor was required before revesting of title to the patent. Not only does the Agreement in this case contain no such automatic reversion clause, but it also specifically requires written notice of termination.

Sebro argues that the Agreement was rescinded early in 1989. Its own conduct belies that contention. Throughout 1989, Sebro continued to meet its obligations under the 1988 Agreement. After December of 1988, Sebro sold "POPS ON" products

to Chesapeake, which it knew had assumed Majestic's obligations under the Agreement as a successor or assign.[8] Even after the date when Sebro says that it learned of facts indicating that Chesapeake had not purchased the business operations of Majestic, Sebro continued to sell "POPS ON" products to Chesapeake. Sebro's termination letter in May of 1990 indicates that Sebro itself interpreted the Agreement as requiring written notice in order to terminate the Agreement. It is thus apparent that Sebro recognized that the Agreement remained in effect until at least May of 1990.

■ Moreover, without the approval of the Bankruptcy Court, the Agreement could not in any event have been terminated after February of 1989. Evidence does not exist to support Sebro's argument that Majestic abandoned the Patent Application before bankruptcy proceedings were commenced in February of 1989. There was no contact between Sebro and the Lieberman firm until April of 1989. Once Majestic's bankruptcy intervened, a mere telephone communication by a secretary of an officer of the debtor could hardly amount to an abandonment of an asset then owned by the debtor.

11 U.S.C. § 554 provides that only the bankruptcy trustee or the Court may abandon property of a debtor's estate. Section 541 of the Bankruptcy Code defines property of the estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case." Clearly, a debtor's contract rights and its interest in a patent constitute property of the estate. *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1471 (D.C.Cir.1991).

Inasmuch as Majestic's bankruptcy proceedings were pending in the Spring of 1989, a fact well known to Sebro, any attempt by Sebro in April of 1989 to terminate the 1988 Agreement and seek a reversion of the patent rights should have been addressed to the Bankruptcy Court. Chesapeake should, of course, have received

---

**8.** Under the 1988 Agreement, Sebro could sell products only to Majestic or its "successors and    assigns."

notice of such action since Sebro knew of Chesapeake's claim to the patent. Instead of seeking Bankruptcy Court approval of its actions, Sebro acted unilaterally and surreptitiously in an effort to keep Chesapeake in the dark concerning its intentions. By way of contrast, Sovran applied to the Bankruptcy Court to enforce its rights in the patent, and the sale of such rights to Chesapeake had the approval of the Bankruptcy Court.

For these reasons, this Court finds and concludes that Majestic's contract rights arising under the 1988 Agreement, including its ownership of the Patent Application, constituted property of the bankruptcy estate and that any purported abandonment of that property during the bankruptcy proceedings without the approval of the Bankruptcy Court was invalid as a matter of law.

### (c)
#### Sebro's Letter of May 1, 1990

■ As his so-called "fourth level of reliance," counsel for Sebro argues that Sovran and Chesapeake never acquired rights to the Patent under the 1988 Agreement because Sebro formally terminated the Agreement by sending the default letter to Majestic on May 1, 1990. Chesapeake contends that Sebro's purported letter of termination was void because, *inter alia*, the action which Sebro intended to take by that letter violated the automatic stay provisions of 11 U.S.C. § 362. This Court would agree that Sebro's attempted termination of the 1988 Agreement in May of 1990 was without legal effect because Majestic was in bankruptcy when the letter was sent. The action taken by Sebro pursuant to its May 1, 1990 letter violated the bankruptcy stay and was accordingly void. *In re Lamkin,* 116 B.R. 450 (Bankr.Md.1990).

The formal notice of breach required by Paragraph 10 of the Agreement was not sent until May of 1990, even though Sebro alleges that it knew of conditions giving rise to the breach in mid–1989. Even assuming under *Baumel, supra,* that Sebro did not waive its right to rescind by its unexplained delay, Sebro's belated notice was ineffective for a number of reasons.

First, contract rights existing under the 1988 Agreement constituted property of Majestic's bankruptcy estate. Accordingly, Sebro's attempt to terminate the Agreement during the pendency of the bankruptcy proceedings was an attempt to obtain property of the estate in violation of the automatic stay provision of § 362 and was "void and without effect." *In re Joyner,* 46 B.R. 130, 135 (Bankr.M.D.Ga.1985).

· Sebro cites *Valley Forge Plaza Assoc. v. Schwartz,* 114 B.R. 60 (Bankr.E.D.Pa. 1990), in support of its contention that it was entitled to terminate the 1988 Agreement notwithstanding provisions of the Bankruptcy Code. However, "[i]t is undisputed" that property of the debtor's estate includes "the debtor's intellectual property, such as interests in patents, trademarks, and copyrights." *United States v. Inslaw, Inc., supra,* at 1471. The Fourth Circuit has specifically noted that the stay provisions of § 362 apply to contracts which constitute property of a debtor's estate. *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1001 (4th Cir.1986) (insurance contract constitutes property of debtor's estate and insurer's right to cancel contract pursuant to its terms is stayed under § 362(a)(3)). The Ninth Circuit, distinguishing termination provisions of the type involved in *Valley Forge Plaza Assoc.* from provisions of the type involved in this case, has held that a party is not entitled to cancel a debtor's contract pursuant to its terms where the contract required "cause" to terminate and 90 days notice. *In re Carroll,* 903 F.2d 1266, 1271 (9th Cir.1990). Since Sebro's acts were obviously intended to obtain property of the debtor during the pendency of bankruptcy proceedings, its attempt to rescind the 1988 Agreement amounted to a clear violation of § 362(a)(3).

■ Second, Sebro's purported letter of termination stated: "Your breach is that we have received neither orders from you nor compensation." However, conduct of this sort on the part of Majestic did not constitute a breach of the Agreement. By its terms, the Agreement itself did not require Majestic to submit any orders; rather, the Agreement provided that if Majestic

marketed these products, it would purchase them from Sebro or pay a royalty to Sebro. Majestic did not sell any "POPS ON" products after December of 1988 but in that month delegated to Chesapeake any obligation which Majestic had to perform under the Agreement. *Macke Co. v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 270 A.2d 645 (1970) (duties delegable if they do "not mount up to such a change in the performance of obligations under the agreements"). This arrangement was known by and approved by Sebro. In fact Sebro received substantial economic benefits from this arrangement by selling millions of shoulder guards to Chesapeake in 1989 and 1990 and by realizing over $798,000 in revenues. Sebro can hardly now claim that Majestic's delegation of its obligations to Chesapeake was a breach of the 1988 Agreement, particularly since the Agreement also provided that Sebro was not to manufacture the "POPS ON" product for anyone other than Majestic.

For more than a year, Sebro recognized and benefitted from Majestic's delegation to Chesapeake of its performance obligations under the Agreement. Thus, its purported letter of termination is also without legal effect because Majestic did not breach the Agreement in the manner alleged in the notice.

### (d)

### *The Alleged Estoppel*

■ Sebro next contends that the 1988 Agreement never constituted property of the estate because Majestic failed to list it as an asset in its bankruptcy schedules. Sebro cites several cases in support of its argument that a debtor who omits assets from his bankruptcy schedules is estopped from subsequently claiming an interest in the omitted assets. *Mason & Dixon Lines, Inc. v. First National Bank*, 883 F.2d 2, 4 (4th Cir.1989); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir.1988), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988); *In re H.R.P. Auto Center, Inc.*, 130 B.R. 247, 254 (Bankr.N.D.Ohio 1991); *In re Mahan*, 104 B.R. 300, 301–12 (Bankr.E.D.Cal.1989). These decisions are inapposite here. The cases cited merely discuss the doctrines of judicial and equitable estoppel and stand for the proposition that debtors who fail to assert counterclaims against secured creditors during the course of bankruptcy proceedings may be estopped from later pursuing claims against those creditors.

■ A bankruptcy trustee or debtor in possession is not estopped from claiming title to a patent application merely because of the failure of the debtor to list it on the schedule of assets. 5 E. Lipscomb, *Lipscomb's Walker on Patents*, § 19:35, at 448–50 (3d Ed.1986). In *Mills Novelty Co. v. Monarch Tool & Mfg. Co.*, 49 F.2d 28 (6th Cir.), *cert. denied*, 284 U.S. 662, 52 S.Ct. 37, 76 L.Ed. 561 (1931), the debtor/inventor, who had previously joined with another in filing a pending patent application, filled out the section of his schedule of personal property assets entitled "Patents, Copyrights and Trademarks" by writing the word "None." Observing that the trustee would not thereby be foreclosed from asserting a timely claim to the patent as property of the estate, the Court said:

> The theory most favorable, as against complete revestiture in the bankrupt, would seem to be that the failure to schedule or otherwise give notice to the trustee would extend the reasonable time with which he or those entitled to do so might elect whether the title should be taken over for the benefit of the bankrupt estate.

*Id.* at 32.

Moreover, the failure of Majestic to list its rights in the then pending Patent Application in the schedule of assets filed in the bankruptcy case would hardly defeat Sovran's pre-existing lien. Even if the contract and patent rights did not constitute a specific asset of the bankruptcy estate, Sovran, as a secured creditor, had the right in any event to repossess this asset and sell it to Chesapeake.

On the record here, this Court finds and concludes that Chesapeake is not estopped from claiming title to the Patent merely because Majestic failed to list the Agreement and its patent rights as assets in its bankruptcy schedules.

Defendant Sebro also argues that Chesapeake is guilty of inequitable conduct in prosecuting the patent after August 20, 1990 without giving notice to Sebro. The record here discloses no inequitable conduct or fraud on the part of Chesapeake at any time before issuance of the Patent. Nor were there material misrepresentations made by any representative of Chesapeake, which had every right to purchase from Sovran the latter's interest in the Patent. Once Chesapeake had gained clear title to the patent rights, it was entitled to prosecute the Patent Application in the PTO with attorneys chosen by it, and it had no duty to advise Sebro of steps it was taking in the PTO to have the Patent issued.

### (e)
### *The Alleged Executory Contract*

Finally, Sebro argues that the 1988 Agreement was an executory contract and that Majestic's interest was not properly transferred to Sovran pursuant to provisions of the Bankruptcy Code because Majestic did not assume the Agreement by curing its existing defaults and because Majestic did not provide Sebro with assurance of future performance. The default alleged by Sebro is Majestic's failure to prosecute the Patent Application and its failure to pay fees owed to the Lieberman firm. There is no merit to this argument. On the record here, this Court concludes that the 1988 Agreement is not an executory contract under provisions of the Bankruptcy Code.

11 U.S.C. § 365(b)(1) provides as follows:
(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(f)(2) is as follows:
(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

Under the Bankruptcy Code, "a contract is executory if the 'obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.'" *Gloria Manufacturing Corp. v. International Ladies' Garment Workers' Union,* 734 F.2d 1020, 1022 (4th Cir.1984) (quoting Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973)). The provisions of § 365 have been held to apply to a secured creditor's post-petition enforcement of a security interest in contract rights. *In re Cobham Enterprises, Inc.,* 62 B.R. 191, 195 (Bankr.S.D.N.Y.1986). A secured creditor's "interest in the collateral is necessarily subject to all its deficiencies," and a trustee or debtor-in-possession must assume the executory contract and cure its defaults before the secured creditor can take the collateral. *Id.* at 194–95.

However, by its terms, § 365 applies only to "executory contracts" and unexpired leases. Courts have consistently held that agreements conveying patent rights, even if they reserve continuing rights to the parties including the right of termination, constitute grants of title and are not executory in nature. *Kenyon v. Automatic Instrument Co.,* 160 F.2d 878, 882 (6th Cir.1947) (agreement assigning patent rights not executory despite ongoing per-

formance obligations and right of termination); *Commissioner v. Celanese Corp.,* 140 F.2d 339 (D.C.Cir.1944) (assignment not executory despite royalty and termination provisions); *Kronner v. United States,* 110 F.Supp. 730, 126 Ct.Cl. 156 (1953) (assignment not executory despite "best efforts" manufacturing requirement and termination clause).

 Applying the principles of these cases to the facts of record here, this Court concludes that the 1988 Agreement is not an executory contract subject to § 365. This was not a license agreement but rather constituted an outright grant of title by Sebro to Majestic. *See Kenyon v. Automatic Instrument Co.,* 160 F.2d 878, 881 (6th Cir.1947). The sole continuing obligation which the Agreement imposed upon Majestic and its successors and assigns was to make royalty payments to Sebro of $1.50 per thousand units unless Majestic elected to utilize Sebro to manufacture the "POPS ON" product, in which event the royalty was to be "[b]uilt into the purchase price." Although not spelled out in the Agreement, Majestic had an obligation to pay the costs associated with prosecuting the Patent Application. However, this was a matured obligation. A contract is not executory as to a party simply because that party is obligated to make payments of money. *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046 (4th Cir.1985). Failure of Majestic to pay a debt owed to its attorneys hardly constituted a material breach of the contract excusing the performance of Sebro. Even if there had been a material breach, the Agreement could not be terminated unless Sebro gave timely written notice of same and afforded Majestic an opportunity to cure the default. As noted hereinabove, Sebro's attempt to give notice was invalid because of the pendency of the bankruptcy proceedings. On the record here, this Court is satisfied that the 1988 Agreement constituted an outright conveyance of title and was not an executory contract.

## IV
### *Conclusion*

For the reasons stated, this Court concludes that the PTO correctly issued U.S. Patent No. 4,988,022 to Chesapeake as assignee of record. Chesapeake was validly assigned rights in the Patent by Sovran and is now the owner of the Patent. Final judgment will therefore be entered in favor of plaintiff Chesapeake against defendant Sebro on the complaint, and final judgment will also be entered in favor of counter-defendant Chesapeake against counterplaintiff Sebro on the counterclaim.

An appropriate Order will hereafter be entered by the Court.