8 F.3d 817
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
CHESAPEAKE FIBER PACKAGING CORPORATION, a Maryland
corporation, Plaintiff-Appellee,
v.
SEBRO PACKAGING CORP., a New Jersey corporation, Defendant-Appellant.
 No. 92-1776.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 2, 1993.
Decided: November 2, 1993.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Alexander Harvey, II, Senior District Judge. (CA-91-767-H)
 ARGUED: Richard Thomas Tomar, Margolius, Mallios, Davis, Rider & Tomar, Washington, D.C., for Appellant.
 Peter Henrik Gunst, Hazel & Thomas, P.C., Baltimore, Maryland, for Appellee.
 ON BRIEF: Ernest P. Francis, Margolius, Mallios, Davis, Rider & Tomar, Washington, D.C., for Appellant.
 Allan P. Hillman, Mary E. Goulet, Hazel & Thomas, P.C., Baltimore, Maryland, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before WILKINSON and WILKINS, Circuit Judges, and PAYNE, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Sebro Packaging Corp. ("Sebro") appeals the grant of summary judgment against it on the complaint of Chesapeake Fiber Packaging Corp. ("Chesapeake") seeking a declaration that Chesapeake is the owner of United States Patent No. 4,988,022 (the"022 Patent"). Sebro also appeals the denial of its motion for summary judgment on its counterclaim seeking a declaration that it, not Chesapeake, is the owner of the 022 Patent. We affirm the decision of the district court.
 
 I.
 
 2
 The 022 Patent covers a fiberboard shoulder guard to be used with wire coat hangers. The shoulder guard was invented by Joel Seitz, an officer of Sebro, in 1987. Thereafter, Sebro, which is in the business of making, converting and selling paper products for use in the dry cleaning business, marketed the product under the name "POPS ON." The following undisputed facts led to the filing of this action seeking a decision whether the 022 Patent is owned by Sebro or by Chesapeake.
 
 
 3
 In the Fall of 1987, Seitz showed his invention to Irving Glassner, President of the Packaging Division of Majestic Industries, Inc. ("Majestic"), a distributor of various products to the retail dry cleaning trade and one of Sebro's customers. Shortly thereafter, Sebro and Majestic undertook negotiations of an agreement pursuant to Majestic which would become the exclusive distributor of the"POPS ON" product. While those negotiations were pending, Sebro began to sell "POPS ON" shoulder guards to Majestic which, in turn, sold them to the retail dry cleaning trade. By the Spring of 1988, Sebro and Majestic reached an oral agreement whereby Sebro would assign all of its rights in the invention to Majestic and make the product for Majestic, while Majestic would be entitled to the exclusive right to market and promote the product.
 
 
 4
 During the negotiations, Sebro and Majestic discussed the need to secure patent protection for the invention. Glassner, on behalf of Majestic, orally agreed to pay the legal fees and costs required to apply for, and prosecute, the patent. On May 5, 1988, the law firm of Lieberman, Rudolph & Nowak ("the Law Firm"), having been retained by Majestic, filed an application in Seitz' name with the United States Patent and Trademark Office ("PTO").
 
 
 5
 On July 13, 1988, Seitz assigned all of his rights and interests in the invention and the patent application to Sebro and Majestic, and Sebro executed a written agreement (the "1988 Agreement") by which Sebro, inter alia, assigned its entire right, title and interest to the "POPS ON" invention and the patent application to Majestic. Paragraph 2 of the 1988 Agreement provides:
 
 
 6
 Sebro hereby sells, assigns, transfers and sets over to Majestic its entire right, title and interest in, to and under the aforesaid Invention(s), and any and all letters of Patent that have been, or may hereafter be granted therefor in the United States of America and in all foreign countries where Majestic may elect, at its sole and exclusive option, to secure patent protection.[1]
 
 
 7
 Sebro reserved for itself a fixed royalty in Majestic's sales of the "POPS ON" product, and agreed to manufacture the product solely for Majestic. Majestic was given the exclusive right to distribute the product.
 
 
 8
 The 1988 Agreement: (1) permitted the parties to assign their contractual rights, duties and obligations; (2) expressly provided that the agreement could be terminated only for material breach following written notice and a 90-day opportunity for cure, and (3) contained an integration clause. The 1988 Agreement did not obligate Majestic to prosecute a patent application for the "POPS ON" product, and it was silent respecting Majestic's earlier oral agreement to pay for the prosecution of the patent. However, it is not disputed that Majestic, through Glassner, orally agreed to pay the costs of prosecution.
 
 
 9
 The interests which Sebro assigned to Majestic on July 13, 1988, immediately became subject to the terms of a properly perfected 1987 credit agreement between Majestic and Sovran Bank, N.A. ("Sovran"). Under the terms of that agreement, Sovran acquired a first lien on all of Majestic's existing and after-acquired assets, including patent rights.
 
 
 10
 Sebro continued to manufacture "POPS ON" shoulder guards and to sell them exclusively to Majestic throughout the Fall of 1988. Meanwhile, the Law Firm continued to prosecute the previously filed patent application.
 
 
 11
 In December 1988, Majestic discontinued its packaging division. Irving Glassner and his son left Majestic and joined Chesapeake, taking with them the business of the packaging division, which included sales and distribution of "POPS ON" products. Chesapeake purchased Majestic's inventory of boxes, packaging equipment and other supplies, and Glassner and his son brought with them the customer and supplier relationships formerly belonging to Majestic's packaging division. All of this occurred with the consent of Majestic's president, who on December 22, 1988, wrote to Glassner that:
 
 
 12
 This will confirm our many conversations wherein I advised you that Majestic Industries, Inc. will discontinue their Packaging Division effective December 31, 1988.
 
 
 13
 It is my understanding that you wish to join with Chesapeake Fiber Packaging Corporation and continue to work in the "Laundry Packaging Business" and perform the same functions and services that were heretofore performed by Majestic Industries, Inc. Packaging Division.
 
 
 14
 This letter expresses my acknowledgement and unconditional consent for you to join with Chesapeake Fiber Packaging Corporation and to continue in the "Laundry Packaging Business", calling on the same customers and performing services in the "Laundry Packaging Business", as were heretofore performed by Majestic Industries, Inc. Packaging Division.
 
 
 15
 Also, on December 22, 1988, Chesapeake, through Glassner, informed Sebro's president, Paul Kiselik, that Chesapeake intended to continue Majestic's former packaging business. Sebro agreed to continue to manufacture the "POPS ON" product for Chesapeake, but insisted on a 15% price increase, to which Chesapeake agreed. Sebro immediately thereafter began shipping the "POPS ON" product to Chesapeake with the words "Chesapeake Fiber Corporation Patent Pending" embossed on the product. The record shows that, notwithstanding advice from the Law Firm in February of 1990 that to do so might infer ownership of the patent in Chesapeake, Sebro continued to emboss that notation on the products it made for Chesapeake from December 1989 through July 1990.[2] Sebro has realized almost $800,000 in revenue from its sales of "POPS ON" to Chesapeake.
 
 
 16
 On October 31, 1988, the patent application was rejected by the PTO. By letter dated January 8, 1989, the Law Firm notified Majestic that action was needed to maintain the viability of the patent application. Two days later, January 10, 1989, the Law Firm dispatched another letter to Majestic inquiring when it might expect payment of its legal fees. Majestic did not respond to either of the letters.
 
 
 17
 Then, on February 9, 1989, Majestic filed a voluntary chapter 11 bankruptcy petition, and thereafter managed its affairs as a debtor-in-possession. At the time of the bankruptcy filing, Majestic still owned all right and title to the "POPS ON" invention and any patents for it, subject to Sovran's perfected security interest. Also, Majestic had assigned to Chesapeake its right to purchase the"POPS ON" product from Sebro under the 1988 Agreement.
 
 
 18
 On March 20, 1989, a secretary at Majestic instructed the Law Firm to abandon the patent application. The Law Firm memorialized that conversation in a letter to Majestic. On April 18, 1989, the Law Firm stopped all work on the application and filed a proof of claim for its legal fees.
 
 
 19
 On April 20, 1989, Sebro contacted the Law Firm to inquire about the status of the patent application and was informed that the application would be abandoned if the Law Firm's fees were not paid. On April 28, 1989, Sebro, acting through Kiselik, told the Law Firm that Sebro would pay the $2,780 in outstanding legal fees owed by Majestic on account of the patent prosecution, if the patent were prosecuted and obtained in Sebro's name. Kiselik insisted that this work be done in absolute secrecy. The Law Firm agreed to Kiselik's proposal, but declined to give Sebro an opinion respecting how Majestic's bankruptcy affected the issue of ownership of the patent.
 
 
 20
 By this time, Majestic had long since been in default of its obligations to Sovran, and hence Sovran acted in the bankruptcy proceedings to exercise its rights as a secured creditor of Majestic. On November 8, 1989, the bankruptcy court entered a Consent Order, agreed to by Sovran and Majestic, which allowed Sovran to take possession of any of Majestic's property subject to the Sovran lien, including the patent and intellectual property rights. Sovran promptly exercised its rights under that order.
 
 
 21
 In April 1990, the Law Firm completed prosecution of the patent and, on April 16, 1990, the Law Firm sent a verified statement to the PTO in which Kiselik swore that Sebro was the only entity with any rights to the invention. By letter dated May 1, 1990, Sebro informed Majestic that it was in default of the 1988 Agreement because it had not placed any orders for the product and because it had not met Sebro's demands for payment. Sebro also asserted that, unless the defaults were cured in 90 days, the 1988 Agreement would be null and void.[3]
 
 
 22
 In mid-1990, Sebro ceased placing the embossed notation "Chesapeake Fiber Packaging Corporation Patent Pending" on the "POPS ON" product and began marketing a similar product under the name "Qwik Shape." Seitz conceded at deposition that this product was covered by the "POPS ON" patent, the application for which was then pending in the PTO.
 
 
 23
 On August 20, 1990, Chesapeake purchased from Sovran its interest in the 1988 Agreement, including the rights to the "POPS ON" invention and patent. On August 28, 1990, Chesapeake filed a notice with the PTO substituting its own counsel for the Law Firm. In order to correct Sebro's false application, on October 4, 1990, Chesapeake filed a petition asking the PTO to identify Chesapeake as Majestic's assignee. By decision dated November 6, 1990, the PTO granted Chesapeake's petition, and on January 29, 1991, the 022 Patent for the "POPS ON" invention was issued to Chesapeake.
 
 
 24
 Chesapeake immediately sent a copy of the 022 Patent to Kiselik, and demanded that Sebro cease the manufacture and sale of its "Qwik Shape" product on the ground that it infringed the 022 Patent. Sebro refused that request, and this litigation followed.
 
 II.
 
 25
 The district court found that, as a matter of law, Chesapeake was the owner of the 022 patent by tracing the chain of title to the invention and patent:
 
 
 26
 The inventor [Seitz] assigned rights in the invention to Sebro which in turn assigned those rights to Majestic; Majestic's secured creditor Sovran repossessed these rights after Majestic had filed for bankruptcy, and Chesapeake purchased rights to the Patent Application from Sovran pursuant to a Consent Order entered by the Bankruptcy Court. The agreements at issue here are unambiguous on the dispositive issues,....
 
 
 27
 Chesapeake Fiber Pkg. v. Sebro Packaging Corp., 143 B.R. 360, 367368 (D. Md. 1992). Finding that there was no ambiguity in the agreements which controlled the question of ownership and that there were no disputes over the facts material to that issue, the district court granted summary judgment declaring that Chesapeake owned the 022 Patent. 143 B.R. at 375.
 
 
 28
 We review de novo the decision granting summary judgment. Higgins v. E.I. DuPont De Nemours & Co., 863 F.2d 1162, 1166-67 (4th Cir. 1988). Having done so, we are persuaded that the district court correctly determined that Chesapeake was the owner of the 022 Patent. On appeal, Sebro advances essentially the same theories it presented to the district court.
 
 
 29
 First, Sebro argues that Sovran did not file notice of its security interest in the PTO; that Sebro was a bona fide purchaser for value of the patent application because it paid the fees of the Law Firm for prosecuting the patent and that, as such, it is entitled to the benefit of 38 U.S.C. § 261 which voids any assignment of patent rights as against subsequent purchasers for value without notice, unless the assignment is timely recorded in the PTO, which it was not. Second, Sebro asserts that Majestic abandoned the patent, thereby effecting a rescission of the 1988 Agreement. Third, Sebro contends that its May 1, 1990, letter terminated the 1988 Agreement before Chesapeake acquired any rights from Sovran. Fourth, Sebro urges that Chesapeake was estopped from claiming title to the 022 Patent because Majestic failed to list in its bankruptcy schedules the 1988 Agreement and the patent rights therein conveyed. Finally, Sebro argues that the 1988 Agreement was an executory contract which was not assumed by Majestic as debtor in possession, thereby precluding an effective transfer to Sovran or consequently to Chesapeake.
 
 
 30
 We have reviewed the issues, studied the briefs and the record and considered the oral arguments advanced by Sebro. We find that the district court's thorough and well-reasoned opinion correctly disposes of each of these issues and that there is no merit to any of Sebro's contentions. Accordingly, we affirm the district court on the basis of its decision. Chesapeake Fiber Pkg. v. Sebro Packaging Corp., 143 B.R. 360 (D. Md. 1992).
 
 AFFIRMED
 
 
 [1]
 On this appeal, Sebro contends that the 1988 Agreement contemplated that Sebro would "assign all marketing and distribution rights for the shoulder guard to Majestic." (Appellant's Brief at p. 7). This interpretation is flatly at odds with the unambiguous language of the 1988 Agreement, by which Sebro assigned "its entire right, title and interest in, to and under" the invention and any subsequently-acquired patents
 
 
 [2]
 The undisputed record also shows that Seitz, who was then the Vice President of Sebro, personally ordered the embossing dyes, the wording of which was personally chosen by Sebro's President, Kiselik. When a new dye was needed, Sebro billed Chesapeake for the replacement costs
 
 
 [3]
 The text of this letter shows that Sebro realized that Majestic was in bankruptcy. (J.A. at 444)